NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 10a0068n.06

Nos. 08-5600, 08-5601, 08-5604

| | |
|---|---|
| UNITED STATES COURT OF APPEALS<br>FOR THE SIXTH CIRCUIT | **FILED**<br>**Feb 03, 2010**<br>LEONARD GREEN, Clerk |

UNITED STATES OF AMERICA,              )
                                                           )
        **Plaintiff-Appellee,**                 )
                                                           )        **ON APPEAL FROM THE UNITED**
v.                                                         )        **STATES DISTRICT COURT FOR**
                                                           )        **THE EASTERN DISTRICT OF**
JERRY LEE LEWIS, RUSSELL       )        **KENTUCKY**
LINDSAY, and JASON FLOWLER,   )
                                                           )
        **Defendants-Appellants.**          )

BEFORE:  KENNEDY, COLE, and GRIFFIN, Circuit Judges.

        **CORNELIA G. KENNEDY, Circuit Judge.**  Defendants Lewis, Lindsay, and Fowler

appeal their convictions of various charges arising out of two physical conflicts between themselves

and fellow inmates.  Each defendant argues that some aspect of the trial was unfair.  We AFFIRM.

**FACTUAL AND PROCEDURAL BACKGROUND**

        September 1, 2006, began like any other day for the one hundred or so inmates who reside

in the A-4 Housing Unit of Big Sandy, a high-security[1] United States Penitentiary located in Eastern

Kentucky.  The housing unit is shaped like a triangle and consists of two floors.  Cells are placed on

both floors and along two legs of the triangle.  Two staircases link the floors.  Dozens of video

cameras are placed throughout the unit.

---

        [1]High security is the highest security designation for prisons operated by the United States
Bureau of Prisons, with the exception of the Administrative-Maximum prison referred to as
"maximum security" or "supermax" in Colorado.

By mid-morning, the prison had completed a daily count of all inmates, and the inmates had eaten breakfast. At 10:00 a.m. the unit was in a state of "open movement," where inmates can move freely throughout A-4. It was at this time that inmates Travis Giles and Michael Eck were attacked by fellow inmates.

According to testimony given at trial, shortly before 10, defendant Russell Lindsay began chasing Giles, yelling, "I'll fucking kill you." In Lindsay's hand was a homemade weapon that was black, nine inches long, apparently made of metal, with green tape around the handle. Prisoner Christopher York followed behind Lindsay, carrying a weapon fashioned out of a belt and combination lock. Giles then ran towards the officer station. Lindsay pursued, and made a stabbing motion towards Giles, while York made a swinging motion. Giles suffered superficial injuries as a result.

Jeffrey Vanover, the officer on duty in A-4 that morning, radioed for back-up. When he saw prison staff responding, Lindsay dropped his weapon behind a door. This was witnessed through a video feed by officer Donnie Adkins, who later testified at trial that he went and retrieved the weapon about five minutes later. He and another officer took several photographs of the weapon, and placed it into a vault in the prison's evidence room. At trial, Adkins identified Government's Exhibit 4 as the "weapon that is in the photos," and testified that it was in substantially the same condition as when he initially retrieved it. Both Lindsay's and York's weapons were introduced into evidence.

As several officers testified, just as this scuffle was ending, another began. Defendant Jason Fowler was just coming down a set of stairs when the first incident occurred. Eck, at the top of the stairs, was walking towards Fowler. Eck pulled out a belt with a combination lock on the end, and

2

began backing up. Fowler's attention was directed towards Eck. Fowler, joined by defendant Jerry Lewis, moved up the stairs. Fowler was in possession of a homemade weapon that resembled an ice pick. As Fowler approached, Eck swung his weapon towards Lewis and Fowler, and attempted to retreat. Billy Buckley, on the floor below, grabbed at Eck's legs. Eck fell, and Buckley proceeded up the stairs. Fowler fell, and Fowler and Eck wrestled on the ground. Fowler made repeated stabbing motions towards Eck, and Lewis kicked Eck in the head. Lindsay, having dropped his weapon in the previous incident, ran over and began kicking Eck as well. Officer Vanover came up the stairs, causing Buckley and Lindsay to disperse. Additional officers arrived, and as Lewis moved away from the altercation, he told Fowler to kill Eck. Officers Adams and Stewart witnessed Fowler laughing while stabbing Eck several times while prison staff attempted to pull them apart. Following the incident, Eck, covered with blood, was taken to a hospital for treatment. He suffered from multiple stab wounds to his rib cage as well as one to his right eye, which had to be removed.

Adams testified that after Fowler had been separated from Eck, Fowler asked how Eck was doing and said that he "hoped the mother fucker died." Adams also testified that Lewis commented that "they got what they had coming."

Buckley, Fowler, Lewis, Lindsay, and York were all named in one indictment on various weapons and assault charges arising from the incidents of September 1. All defendants elected to proceed to trial, but York pleaded guilty after trial had commenced. Defendants did not seriously dispute their involvement, but argued that they had to take the actions out of a need to protect themselves. In response, the government introduced evidence that inmates could ask to be placed in protective custody in what is referred to as the Special Housing Unit (SHU). These cells, which may be shared with another inmate, are smaller than those in the general population. They also

3

house inmates who are being punished for violating prison rules. An inmate in SHU has limited movement and is limited as to what property he can have. Despite these measures, there have been assaults and even a murder in SHU at Big Sandy. In addition to asking to being placed in SHU, an inmate can request a transfer to another prison.

The government called eight members of the prison's staff to testify about the events of the day. The government also introduced a video recording of the events, captured from twelve different angles by various video feeds. In addition, the government called Eck as a witness during its case-in-chief, but he proved to be less cooperative than hoped. The entirety of Eck's testimony on direct was as follows:

> Q. Sir, my name is Rob Duncan. I am an Assistant United States Attorney and I have a few questions to ask you this morning. Is your name Michael Eck?
> A. Yeah.
> Q. And you are currently an inmate in the federal prison; is that correct?
> A. Uh-huh, yeah.
> Q. And you were convicted in the U.S. District Court Northern District of West Virginia in about August or September of 1995?
> A. Yeah.
> Q. And was that for a violation of federal law relating to the use of destructive devices?
> A. Yeah.
> Q. Mr. Eck, on September the 1st, 2006, were you an inmate at the United States Penitentiary Big Sandy?
> A. Yeah.
> Q. Did you live in the A-4 housing unit then?
> A. Yeah.
> Q. And, on that day, do you recall being assaulted?
> A. No.
> Q. So, it's your testimony here that you do not recall being assaulted?
> A. I don't remember.
>> MR. DUNCAN: Your Honor, I would ask that the witness be handed some photographs.
>> THE COURT: Yes.
>> MR. DUNCAN: These are marked.
>> THE COURT: Would you tender those photographs to the witness, please.

BY MR. DUNCAN:
Q. Mr. Eck, I would like you to take a look at those photographs that have been marked as Government's Exhibit --
A. I don't want to look at the photographs. I appreciate it, but I don't want to look at the photographs.
Q. So, that's not you in the photographs; is that what you're saying?
A. I'm not saying that. I'm not looking at the photographs.
Q. So, it's your testimony that you don't recall anything that happened on September the 1st of 2006?
A. That's correct.
Q. And, before that day, did you have sight in your right eye?
A. Excuse me?
Q. Before that day, did you have any injuries?
A. I don't know. I don't recall.
Q. You don't recall being stabbed that day?
A. No.
Q. You don't recall being transported out of the institution by an ambulance?
A. No, sir, I don't.
Q. You don't recall receiving treatment for your injuries?
A. Some treatment. I remember some treatment, yeah, I remember some.
Q. Is that treatment for getting stabbed in the face and the eye?
A. I mean, that's what you're saying, I don't know.

Benjamin Hicks, Lewis's attorney, indicated an interest in cross-examining Eck. Based on the government's objection, the district court would not allow questions about prison life in general because it concluded that such questions went beyond the testimony provided on direct. *See* Fed. R. Evid. 611(b). Outside the presence of the jury, Hicks asked Eck about protective custody. Eck said that he never requested protection because he is "a man," and that he prefers to handle issues himself. He then testified, still outside the presence of the jury:

Q. Okay. And if there's a particular problem with an inmate, can you tell me -- and you don't have to name an inmate or anything like that -- how would you go about trying to resolve something? If you all don't like each other because he cheers for a different team or whatever it may be, how might you do that?
A. I mean, I don't understand what you're saying, man. I mean --
Q. Okay.
A. You know, you're asking me how, what, I take care of problems?
Q. Yes, sir.

5

A. I mean, it depends on what it is. I mean, you know.
Q. What are some of the ways?
A. I mean, get stabbed in the eye, you know what I'm saying?

At this time, the district court advised Eck of his right to be silent, and Eck asked for an attorney. The district court dismissed Eck, appointed an attorney for him, and allowed defendants to recall him during their case.

Lewis and Lindsay attempted to present testimony from Eck during their case. Responding to questions from Lindsay's counsel outside the presence of the jury, Eck refused to answer whether he was an inmate at Big Sandy, whether there was an altercation, and any question concerning weapons. In front of the jury, Lewis's counsel elicited only the following testimony:

Q. Mr. Eck, you have heard the term checking yourself in in the federal penitentiary?
A. Yes.
Q. What is that? Because, understand, we're not in there and we want your insight.
What does that term mean?
A. Going into protective custody.
Q. How long have you been in custody?
A. Since 1994.
Q. So, obviously, over ten years?
A. Yes.
Q. During that period of time, have you ever requested protective custody?
A. No.
Q. Why not?
A. Because I'm a man.

The other defendants chose not to ask any questions of Eck.

The jury found each defendant guilty of certain charges, and the district court dismissed certain charges for violating double jeopardy.[2] Lindsay and Fowler were each sentenced to 120 months incarceration, and Lewis was sentenced to 78 months incarceration.

**DISCUSSION**

---

[2]Buckley was also convicted, but has not appealed his conviction or sentence.

6

**I. Lewis (08-5600)**

In his appeal, Lewis contends that his right to cross-examine Eck was unduly constrained by rulings made by the district court and by Eck's invocation of his Fifth Amendment right to not incriminate himself. We review arguments that evidence was improperly introduced in violation of the Confrontation Clause de novo, *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009), and claims that the district court improperly curtailed cross-examination for an abuse of discretion, *United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002).

The Sixth Amendment guarantees that any criminal defendant is guaranteed the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. This encompasses a right to cross-examination, the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (internal quotations omitted).

Here, Lewis complains that the district court unfairly limited the scope of his cross-examination of Eck. This right to cross-examination is not boundless, and "trial judges retain wide latitude . . . to impose reasonable limits on such cross-examination." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). "The key issue is whether the jury had enough information to assess the defense's theory of the case despite the limits placed on cross-examination." *United States v. Holden*, 557 F.3d 698, 704 (6th Cir. 2009) (citing *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000)). Lewis sought to question Eck about the nature of prison life. Because this testimony would go beyond the scope of direct, the district court did not allow this line of questioning, instructing Lewis's counsel to call Eck during Lewis's case. Lewis did not indicate that he would ask Eck any questions relating to Eck's bias. And Lewis was able to and did call Eck during his case. The Confrontation Clause was not violated under these circumstances. *United States v. Dandy*, 998 F.2d

7

1344, 1350 (6th Cir. 1993) (rejecting a Confrontation Clause challenge when district court limited questions to scope of direct examination and allowed defendant to call witness himself).

Lewis also complains that he was deprived of the opportunity to elicit answers from Eck on cross-examination and in Lewis's case-in-chief because Eck refused to testify. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam) (citations omitted). "A defendant's right to compel testimony yields to a witness's assertion of his or her Fifth Amendment privilege when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593 (6th Cir. 2008) (citations omitted). However, if a witness testifies and then invokes his right against self-incrimination, the Confrontation Clause may be violated. *Douglas v. Alabama*, 380 U.S. 415, 419 (1965). This is true even if the witness's testimony consists only of refusals to answer, because the jury may infer answers to the prosecutor's questions. *See id.*

In this case, Eck provided testimony – claims that he could not remember the events of the day – for the government. Although the district court explicitly allowed Lewis to inquire into the truthfulness of Eck's claims of forgetfulness, Lewis did not seek to cross-examine Eck about his answers on direct examination. Instead, during his offer of proof outside the presence of the jury, Lewis's counsel asked Eck about prison life and protective custody. Eck first invoked his right against self-incrimination when asked questions about how problems are handled in prison. Although this might have made him an unavailable witness had Lewis been cross-examining him before a jury, Eck was not before a jury. Lewis's questioning (and Eck's answers) had already been excluded by the district court as beyond the scope of direct. Eck's invocation of his Fifth

8

Amendment rights during the offer of proof did not interfere with Lewis's cross-examination; the district court's ruling as to the scope of cross-examination did. And as explained above, there was no Constitutional error in the district court's ruling.

In any event, because "the Constitution entitles a criminal defendant to a fair trial, not a perfect one," we will not reverse any Confrontation Clause error that is harmless beyond a reasonable doubt. *Van Arsdall*, 475 U.S. at 681; *United States v. McGee*, 529 F.3d 691, 697 (6th Cir. 2008).[3] Here, Eck's testimony – which denied any memory of the day's events – provided extremely little, if nothing, to the government's case. The jury had the benefit of testimony of several eyewitnesses and a video recording of the events that morning made from cameras at multiple locations. Lewis overcame any error by the district court in unduly circumscribing Eck's cross-examination by calling him as an adverse witness during his case. And any error in allowing Eck's testimony to stand despite his later invocation of the Fifth Amendment is harmless beyond a reasonable doubt, in light of the utter lack of any substance provided in Eck's testimony during the government's case. Therefore, we AFFIRM Lewis's conviction.

## II. Lindsay (08-5602)

---

[3]In *United States v. Baker*, 458 F.3d 513, 520 (6th Cir. 2006), we suggested that the lower-threshold harmless error test applicable to other evidentiary errors applied to evidence admitted in violation of the Confrontation Clause. The case we cited for that proposition, *United States v. Pugh*, 405 F.3d 390, 400 (6th Cir. 2005), in turn relied on *Jordan v. Hurley*, 397 F.3d 360, 363 (6th Cir. 2005). In *Jordan*, a habeas case, we made it clear that Confrontation Clause violations are reviewed for the harmless error review we apply to constitutional claims. Because *Jordan* was a habeas case, we applied the *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) standard that looks to whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." However, on direct appeal, we review such claims for harmless error under the harmless-beyond-a-reasonable-doubt standard of *Chapman v. California*, 386 U.S. 18 (1967). *E.g. Van Arsdall*, 475 U.S. at 681; *United States v. Moses*, 137 F.3d 894, 901 (6th Cir. 1998). To the extent *Baker* suggests otherwise, it is inconsistent with prior decisions by this court and the Supreme Court.

## A. Sixth Amendment

Lindsay argues that his Confrontation Clause rights were violated because he was not allowed to ask Eck questions about the testimony of *other* witnesses. This claimed error does not implicate the Confrontation Clause, because Lindsay had a full opportunity to cross-examine *those* witnesses. Instead, Lindsay contends that he should have been able to use Eck to contradict the testimony of the other witnesses, which implicates another one of his rights: his right to call witnesses on his behalf, "a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967); *United States v. Foster*, 128 F.3d 949, 953 (6th Cir. 1997).

Lindsay was able to secure Eck's presence at trial; however, he was not able to compel him to testify because Eck invoked his privilege against self-incrimination. When such a conflict is present, "[a] defendant's right to compel testimony yields to a witness's assertion of his or her Fifth Amendment privilege when the claimed privilege is grounded on a reasonable fear of prosecution." *United States v. Highgate*, 521 F.3d 590, 593 (6th Cir. 2008) (citations omitted). Given that the government refused to state whether it planned to prosecute Eck, his claim of privilege was well-grounded.

Lindsay does not challenge the district court's ruling that Eck could refuse to testify. Instead, he argues that "[f]airness" required that the government grant Eck immunity so that there could be no reasonable fear of prosecution. "To the extent that Defendant challenges the decision of the prosecution not to give [a witness] immunity in exchange for his testimony, such a claim is not cognizable." *United States v. Emuegbunam*, 268 F.3d 377, 401 (6th Cir. 2001). Some courts have recognized a limited exception to this rule "when a witness possesses exculpatory testimony that is essential to an effective defense and that strongly outweighs the government's interests in declining

to offer immunity." *Id.* (citing *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999)).[4]

However, "this court has previously discussed and rejected" this exception. *Talley*, 164 F.3d at 997

(citing *United States v. Mohney*, 949 F.2d 1397, 1401 (6th Cir. 1991)). Even if we did require

immunization under the "effective defense" theory, Lindsay has not shown that his right to present

a defense was denied when the government declined to immunize Eck.

## B. Admission of Exhibit 4

Lindsay also contends that the admission of Government's Exhibit 4, the weapon attributed

to Lindsay, was in error.[5] We review the district court's ruling for an abuse of discretion, *United*

*States v. DeJohn*, 368 F.3d 533, 542 (6th Cir. 2004), but we ignore any error that does not affect the

defendant's substantial rights, Fed. R. Evid. 103(a); Fed. R. Crim. P. 52(a).

An exhibit may only be admitted if there is "evidence sufficient to support a finding that the

matter in question is what its proponent claims." Fed. R. Evid. 901(a). At trial, Adkins testified that

he witnessed on the video while it was happening Lindsay place the weapon behind a door, and that

he went and retrieved it minutes later. He then took photographs of the weapon and lodged it into

the prison's evidence vault. Adkins testified that the weapon introduced at trial was the same

---

[4]We have also recognized two additional exceptions – when the government selectively grants immunity to its own witnesses while denying it to a defendant's, and when necessary to remedy prosecutorial misconduct, *Emuegbunam*, 268 F.3d at 401 & n.5 – but these exceptions are not applicable to this case.

[5]Although the government does not argue waiver, it also appears that Lindsay did not preserve his objection. He initially objected when the weapon was first offered, and a sidebar conference was held where the judge overruled the objection "assuming that some additional questioning" of Adkins would provide a proper foundation. Three additional questions were asked of the witness, and the government again moved for its admission. There was no objection at this time.

11

weapon that was in the photographs and that it had not been altered. This satisfies the threshold admissibility requirement.

Lindsay first challenges the exhibit's admissibility by arguing that the government failed to establish a chain of custody of the exhibit, leaving open the possibility of tampering. As Lindsay concedes, we have repeatedly held that "[a]bsent a clear abuse of discretion, 'challenges to the chain of custody go to the weight of the evidence, not its admissibility.'" *United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997) (quoting *United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990)). He contends that in this case there was such an abuse of discretion because the exhibit "was handled in such a negligent and cavalier manner and without proper safeguards." Br. at 8. He does not explain this assertion further, and the record does not support this claim. The undisputed evidence presented at trial indicates that the officers carefully documented each step between recovery of the weapon and its placement into the evidence vault.

Second, he argues that "the exhibit was never conclusively identified." "Physical evidence is admissible when the possibility of misidentification or alteration is 'eliminated, not absolutely, but as a matter of reasonable probability.'" *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004) (quoting *Allen*, 106 F.3d at 700). Here, there was no reasonable probability of misidentification. *See id.* (holding that district court did not plainly err when it admitted guns that had been given to a private citizen in between their seizure from the defendant and the trial, and noting that "there was no reasonable probability of misidentification"). To the contrary, Adkins made a positive identification at trial. Lindsay's arguments go to the weight of the evidence, which is a matter for the trier of fact, not this appellate court. Finding no reversible error, we AFFIRM Lindsay's conviction.

### III.  Fowler (08-5604)

#### A.  Severance

In Fowler's first claim of error, he argues that he should have been given a separate trial from those defendants only charged in an unrelated incident.

Rule 8 provides that multiple defendants may be joined in a single indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  "The joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions, even if all counts of the indictment include a common defendant."  *United States v. Hatcher*, 680 F.2d 438, 441 (6th Cir. 1982).  "[A] group of acts or transactions constitutes a 'series' if they are logically interrelated," such as when "the acts or transactions are part of a common scheme or plan."  *United States v. Johnson*, 763 F.2d 773, 776 (6th Cir. 1985).

We look to the allegations in the indictment to determine whether joinder was proper.  *Schaffer v. United States*, 362 U.S. 511, 513-14 (1960); *United States v. Deitz*, 577 F.3d 672, 691 (6th Cir. 2009); *United States v. Chavis*, 296 F.3d 450, 460 (6th Cir. 2002); *United States v. Frost*, 125 F.3d 346, 389 (6th Cir. 1997); *see also United States v. Rittweger*, 524 F.3d 171, 178 (2d Cir. 2008) (Sotomayor, J.) ("Under the plain language of Rule 8(b), the decision to join parties turns on what is 'alleged' in the "indictment.  Events that transpire at trial are thus not relevant to the Rule 8(b) inquiry." (internal quotations omitted)); 1A Fed. Prac. & Proc. Crim. § 144.  We have at other times, however, also considered the government's proofs when assessing the propriety of joinder.  *United States v. Saleh*, 875 F.2d 535, 538 (6th Cir. 1989); *Hatcher*, 680 F.2d at 441; *United States*

13

*v. Franks*, 511 F.2d 25, 29 (6th Cir. 1975). "If multiple defendants are improperly joined under Rule 8(b) because they are charged with offenses that are unrelated, then they are to be considered as prejudiced by that fact and the trial judge has no discretion on the question of severance. Severance in such a case is mandatory." *Hatcher*, 680 F.2d at 441. We review whether joinder was proper de novo. *Deitz*, 577 F.3d at 692.

While defendants allegedly participated in the same series of criminal acts, we need not resolve whether joinder was proper in this case because we will uphold an erroneous joinder "unless it results in 'actual prejudice' because it had a 'substantial and injurious effect or influence' on the jury's verdict." *United States v. Lloyd*, 10 F.3d 1197, 1214 (6th Cir. 1993) (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)). We apply this rule "with great caution." *Hatcher*, 680 F.2d at 442. In cases of improper joinder, the error is harmless "only where the unrelated charge and the evidence supporting that charge is such an inconsequential part of the joint indictment and trial that no possible harm from the misjoinder could reasonably have occurred." *Id.* The presence of the following factors supports a finding of harmlessness: "overwhelming evidence of guilt, the fact that limiting instructions were given to the jury, and the fact that evidence concerning the misjoined counts would have been admissible in separate trials absent joinder." *Chavis*, 296 F.3d at 461. It is the government's burden to demonstrate that any error was harmless. *Id.*

The government has carried its burden of showing that any error was harmless. To begin, the evidence against Fowler was overwhelming. Moreover, "[e]rror based on misjoinder is almost always harmless where, as here, the trial court issues a careful limiting instruction to the jury on the issue of possible prejudice resulting from the joinder." *See United States v. Cody*, 498 F.3d 582, 587 (6th Cir. 2007). "[I]t would not have been difficult for the jury to compartmentalize and distinguish

14

the evidence" concerning the various charges and defendants, given the simplicity of the facts and law. *See Chavis*, 296 F.3d at 462. Moreover, Fowler's defense was not that there was no attack, but that he was justified in his actions, or possibly misidentification. The evidence that another fight occurred almost simultaneously with the attack on Eck had no reasonable probability of influencing the jury's verdict. Fowler suffered no prejudice from being tried with the other defendants

In view of our finding that any error from joinder did not result in prejudice, Fowler was not entitled to severance of his trial. Severance should be granted "'only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.'" *United States v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)). A defendant is not entitled to severance merely because having a separate trial "might increase the possibility of acquittal." *United States v. Parks*, 278 F. App'x 527, 531 (6th Cir. 2008) (citing *Zafiro*, 506 U.S. at 540). Rather, to be granted this "extraordinary remedy," *United States v. Harris*, 200 F. App'x 472, 515 (6th Cir. 2006) (internal quotation marks and citation omitted), the defendant must demonstrate "compelling, specific, and actual prejudice," *United States v. Gardiner*, 463 F.3d 445, 473 (6th Cir. 2006) (internal quotation marks and citation omitted).

Fowler argues he suffered prejudice from being jointly tried because the jury listened to extensive testimony about crimes in which he was not alleged to have been involved. This argument is unavailing. "Juries are presumed to be capable of following instructions . . . regarding the sorting of evidence and the separate consideration of multiple defendants." *United States v. Walls*, 293 F.3d 959, 966 (6th Cir. 2002). Fowler has offered no reason to believe that the risk of prejudice he faced was greater than that present in any joint criminal trial. A review of the record suggests that the

15

evidence against each defendant was readily delineable; indeed, much, perhaps most, of the evidence presented concerned Fowler's attack on Eck. In addition, the district court clearly instructed the jury that its duty was to separately consider the evidence against each defendant and to return a separate verdict for each one of them. *Cf. Lloyd*, 10 F.3d at 1216 (affirming the denial of a motion for severance where the trial judge was careful to instruct the jury on its duty to consider separately the evidence against each defendant). In the absence of "compelling, specific, and actual prejudice," *Gardiner*, 463 F.3d at 473, Fowler fails to demonstrate that the district court erred in denying his motion for severance.

**B. Jury Instruction on Justification Defense**

Fowler also contends that the district court erroneously refused to give a jury instruction on the justification defense. "When reviewing a district court's decision to deny a specific jury instruction request, this Court applies an abuse of discretion standard." *United States v. Adams*, 583 F.3d 457, 468-69 (6th Cir. 2009) (citing *United States v. Jones*, 403 F.3d 817, 821 (6th Cir. 2005)). "A judgment may be reversed if the instructions, viewed as a whole, were confusing, misleading and prejudicial." *United States v. Burchard*, 580 F.3d 341, 345 (6th Cir. 2009).[6]

In order to receive a jury instruction on justification, there must be a showing of each of the following five elements:

---

[6]The government argues that Fowler has failed to preserve this objection, so we should review it for plain error only. Fowler's counsel argued that a justification instruction was needed at the charge conference. The district court disagreed, and told him that a self-defense instruction would be given, but that it was inappropriate to bootstrap a larger justification theory onto that instruction during closing arguments. When asked what he thought, Mr. O'Neill, Fowler's counsel, said "I have no comment." Rule 30(d) requires a party to object to a failure to give a requested jury instruction before the jury retires to deliberate. If a party fails to object, we can still review the matter for plain error. Because we find no error in the instruction under the higher level of review, we need not decide whether the error was preserved.

16

(1) that defendant was under an unlawful and present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
(2) that defendant had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
(3) that defendant had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; . . .
(4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm; [and] . . .
[5] that the defendant show that he did not maintain the illegal conduct any longer than absolutely necessary.

*United States v. Newcomb*, 6 F.3d 1129, 1134 (6th Cir. 1993) (internal quotations and alterations omitted). The defense also applies when an individual other than the defendant is threatened with harm. *Id.* at 1135.

"A defendant must produce sufficient evidence concerning each element to warrant an instruction on justification to the jury." *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir. 1994) (citing *United States v. Paolello*, 951 F.2d 537, 543 (3d Cir. 1991)). "The defendant's initial burden in establishing these elements is not a heavy one, and is met even where there is weak supporting evidence for the defense. But a jury instruction on justification should not be given if [the defense] lacks evidentiary support or is based upon mere suspicion or speculation." *United States v. Kemp*, 546 F.3d 759, 765 (6th Cir. 2008) (quotations omitted). What the defendant must do is "'produce[] evidence upon which a reasonable jury could conclude by a preponderance of the evidence that each'" element of the defense has been met. *Id.* (quoting *United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008)).

Fowler has not shown that he was entitled to the defense. It is true that on the morning of September 1, 2006, Fowler and several other individuals were at imminent risk of harm by Eck. Evidence was introduced that Eck had armed himself with a weapon, and actually caused injury to

17

Fowler. However, no reasonable jury would find that Fowler had not recklessly or negligently placed himself in the situation calling for criminal conduct. Fowler sought out and pursued Eck, and initiated the attack, rather than seeking protection from a prison guard.[7] Moreover, no reasonable jury would find that Fowler ceased the illegal conduct at the first available opportunity. Eck was backing away, but Fowler advanced on him rather than seeking help from a prison guard. Fowler then stabbed Eck repeatedly after Eck fell, ignoring prison staff's demands that he stop and drop his weapon. There was no basis for a justification instruction.

In any event, any error is harmless. *See* Fed. R. Crim. P. 52(a). The jury considered but rejected Fowler's claim of self-defense. Self-defense, a particular type of justification, is far easier for a defendant to invoke successfully. The jury instruction for self-defense places the burden on the government beyond a reasonable doubt, while the defendant has the burden of establishing other justification defenses. Sixth Cir. Pattern Jury Inst. 6.06; 6.07. Moreover, justification has several additional elements that a defendant must establish above and beyond those in a self-defense instruction. If the jury found that the government had shown beyond a reasonable doubt that Fowler was not justified to act in his own defense, it is implausible that they would find that he had proven that he was justified to act in defense of another under the circumstances of this case. Accordingly, we AFFIRM Fowler's conviction.

**CONCLUSION**

For the reasons stated above, we AFFIRM the defendants' convictions.

---

[7]The threatened harm must be imminent. Thus, while protective custody is not completely safe, it would eliminate the imminent threat posed by an armed inmate in one's immediate vicinity.