**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 16a0348n.06

**Nos. 14-3995, 14-4124, 14-4125, 15-3014, 15-3015**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED** |
| | ) | Jun 24, 2016 |
| Plaintiff-Appellee, | ) | DEBORAH S. HUNT, Clerk |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| MICHAEL L. TEADT, BRADFORD HUEBNER, | ) | OHIO |
| and CHARLES EMMENECKER, | ) | |
| | ) | |
| Defendants-Appellants. | | |

Before: BOGGS and DONALD, Circuit Judges; HOOD, District Judge.[1]

**HOOD**, District Judge. This case involves the consolidated appeals from the convictions of three defendants who were jointly indicted and tried for federal fraud crimes. Following a jury trial, Defendant Huebner was convicted of conspiracy to commit wire fraud, wire fraud, mail fraud, money laundering, and structuring; Defendant Emmenecker was convicted of conspiracy to commit wire fraud and wire fraud; and Defendant Teadt was convicted of mail fraud. The defendants raise numerous issues on appeal, including challenges to the sufficiency of the evidence, the district court's restitution order, the jury instructions, and the prosecutor's conduct.

---

[1] The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

## BACKGROUND

When Michael Teadt and Bradford Huebner met at an art festival in Toledo, Ohio in 2008, the two quickly became friends. Teadt was between permanent jobs, but was selling energy-efficient windows and doors. Huebner told Teadt about his business—Energy Saver Advisors—and invited Teadt to his downtown Toledo office to see the company's products. Teadt ultimately received an invitation from Huebner to use a cubicle at the office while searching for a job. Teadt took Huebner up on the offer and eventually secured employment with a New Jersey-based company called S.S. White. In the meantime, Huebner learned of the Wood County (Ohio) Department of Job and Family Services Project HIRE Program, which would subsidize job training for workers who had been laid off from their jobs. Although Teadt was working at S.S. White, he and Huebner's employee Kelly Bland completed the Project HIRE paperwork and Huebner eventually received more than $5,000 in benefits from the program.

Around this same time, Energy Saver Advisors began to market and sell Iraqi dinars under the name the "BH Group." According to Huebner and his longtime friend Charles Emmenecker, the dinars, each worth a fraction of a cent, would become worth several U.S. dollars overnight based on speculation that the Iraqi government would unilaterally "revaluate" its currency. Shortly after the inception of the scheme, Rudolph Coenen entered the picture. Coenen held himself out to be a foreign-currency expert and former vice president of J.P. Morgan Chase as well as a war hero.[2] The three men used weekly "conference calls" as their main marketing tool. The calls essentially were commercials for dinars and could be accessed by

---

[2] Coenen pled guilty to conspiracy to commit wire fraud, wire fraud, and money laundering and was sentenced to 63 months' imprisonment.

the public by dialing in or listening to a recording on the internet. The men attempted to bolster listeners' confidence in dinar investment by making vague references to Executive Order 13303 and a fictitious statute called the Overseas Investment Protection Act.

Coenen, Huebner, and Emmenecker concocted the idea that, once the dinar revaluation came to pass, their customers would need an appropriate vehicle for the investment of their riches. They created two purported hedge funds and began pre-selling "inception investors' seats." They sold almost 1,000 seats at a price of $750 each. After they began selling the seats, they contacted lawyers and tried to initiate the required paperwork, assuring investors that the SEC was appropriately involved. Apex Fund Services, the company who was engaged to administer the funds initially, withdrew after conducting due diligence.

In the spring of 2011, Huebner began receiving anonymous emails raising serious concerns about Coenen's background as well as the possibility that the dinar scheme and hedge funds were fraudulent. Huebner maintains that he had such great faith in the business and in Coenen, he simply did not believe the claims. Prakash Karamchani and Tim Varner were independent computer experts whom Huebner had hired to set up a subscription news service for the BH Group. Karamchani and Varner became so suspicious that they hired an investigator to look into Coenen's background. The background check revealed that Coenen had not worked at J.P. Morgan, had not served in the military, had no educational background in finance or currency, and had a criminal history. When confronted with this information, Huebner, after consulting with Teadt, contacted the FBI regarding Coenen. Little did Huebner realize that Huebner himself was already under investigation on suspicion of mail and wire fraud. On July 27, 2011—the day he met with an FBI agent to talk about Coenen—agents searched Huebner's home and office, seizing dinars then worth $241,192.38 U.S. dollars.

During a ten-day trial, the jury heard testimony from a host of witnesses, including the defendants. Huebner and Emmenecker were convicted of conspiracy to commit wire fraud and wire fraud in connection with the dinar scheme. Huebner was also convicted of nine counts of money laundering and thirty counts of structuring to evade reporting requirements. Huebner and Teadt were convicted of mail fraud in connection with the Wood County HIRE program.

## DISCUSSION

### I.      Motion to Sever

Prior to trial, the defendants moved to sever Count 3, the mail-fraud charge involving the Wood County HIRE program, arguing that it did not relate sufficiently to the balance of the charges. While defrauding the Wood County HIRE Program formed the substantive basis of the mail-fraud charge, it also was alleged to be an act in furtherance of the wire-fraud conspiracy. The district court concluded that evidence of the HIRE Program fraud was "relevant and necessarily a part of the 'same act or transaction, or . . . the same series of acts or transactions, constituting an offense or offenses' under Criminal Rule 8(b)," and, thus, Count 3 was properly joined. The court also found that none of the defendants would stand a better chance of acquittal if tried on his own, and any risk of prejudice could be cured by proper jury instructions.

We review de novo whether joinder was proper. *United States v. Deitz*, 577 F.3d 672, 692 (6th Cir. 2009). "The joinder of multiple defendants is proper under Rule 8(b) only if each of the counts of the indictment arises out of the same act or transaction or series of acts or transactions." *United States v. Hatcher*, 680 F.2d 438, 441 (6th Cir. 1982). A group of acts or transactions constitutes a series where they are part of a common scheme or plan. *United States v. Lewis*, 363 F. App'x 382, 390 (6th Cir. 2010); *see also* Fed. R. Crim. P. 8(a).

4

We look, as did the district court, to the allegations in the indictment to determine whether joinder was proper. *See Deitz*, 577 F.3d at 691. The indictment alleges that in or about 2010, Teadt allied himself with Huebner regarding the sale of dinars and, later, sales of seats in two non-existent hedge funds. The indictment further alleges that Teadt and Huebner, along with Emmenecker, repeatedly made claims to potential investors over the telephone and internet that even relatively small investors in the Iraqi dinar would became wealthy overnight. Teadt, Huebner, and Emmenecker began marketing the non-existent hedge funds to investors and members of the BH Group, selling seats in the funds for $750 each. The following is listed as an act in furtherance of the conspiracy:

> On or about July 10, 2010 to on or about January 14, 2011, in order to obtain funds to defray the costs of The BH Group's dinar and hedge fund business, [Huebner] and [Teadt] made multiple false and misleading statements to the Wood County (Ohio) Department of Job and Family Services (WCDJFS) by falsifying application documents for WCDJFS's Project HIRE program, resulting in improper payment of taxpayer funds to The BH Group.

Based on the allegations of these logically interrelated transactions, the district court did not err in declining to sever Count 3.

"Rule 14 provides that severance may be granted if substantial prejudice would result to an individual defendant tried jointly with another." *United States v. Licavoli*, 725 F.2d 1040, 1051 (6th Cir. 1984). Huebner contends that he was prejudiced significantly by the inclusion of Count 3. He emphasizes that his business, Energy Saver Advisors, with which Teadt first became involved, was not involved in the dinar scheme. It was through Energy Saver Advisors that he applied for the HIRE Program funding. Huebner testified however, that with respect to the dinar scheme, Energy Saver Advisors was simply doing business as the BH Group. In fact, in the beginning, dinar customers were making payments to Energy Saver Advisors, and

Huebner created the alternative name to minimize confusion. And while there certainly are some aspects of the mail-fraud scheme that do not, at least facially, overlap with the dinar scheme, many circumstances are intertwined. Importantly, Defendants have shown no reason that limiting instructions would not cure any risk of prejudice. *See Zafiro v. United States*, 506 U.S. 534, 540 (1993).

## II.     Sufficiency of the Evidence

### A.     Teadt

Teadt contends that there was insufficient evidence to convict him of mail fraud, as there was no evidence that he knowingly joined a scheme to defraud Wood County. Ordinarily, when the sufficiency of the evidence is challenged on appeal, we must determine, viewing the evidence in the light most favorable to the government, whether any rational trier of fact could have found that the essential elements of the crime were satisfied. *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). To preserve this challenge for appeal, however, the defendant must not only make a motion for acquittal at the conclusion of the government's case-in-chief, but must also renew the motion after the close of the evidence. *United States v. Price*, 134 F.3d 340, 350 (6th Cir. 1998). Because Teadt failed to renew his motion, we review it only for a manifest miscarriage of justice, which exists only when "the record is devoid of evidence pointing to guilt." *United States v. Roberge*, 565 F.3d 1005, 1008 (6th Cir. 2009).

To find Teadt guilty of mail fraud, the jury had to conclude, by a preponderance of the evidence, that each of the following three elements had been proven: "(1) a scheme or artifice to defraud; (2) use of mails in furtherance of the scheme; and (3) intent to deprive a victim of money or property." *United States v. Turner*, 465 F.3d 667, 680 (6th Cir. 2006). Teadt disputes only the third element, relying on his testimony that he had nothing to do with Huebner's

forwarding of the fraudulent documents to Wood County. Further, he claims that he did not personally obtain any funds. Teadt also testified that he believed he was going to be terminated from his job at S.S. White, so he actually would be unemployed sometime in the near future. His plan was to take a job with Huebner's business if the funding from Wood County came through.

Teadt's testimony gives rise to a reasonable inference that he intended to deprive Wood County of funds. When Teadt completed the paperwork for the Wood County HIRE Program, he lied about being unemployed. His testimony suggests that he believed his future employment with Huebner's business was dependent upon funding from Wood County. There is no requirement that Teadt personally received the funds. Based on the foregoing, the record is not devoid of evidence pointing to Teadt's guilt.

### B. Huebner

Huebner also failed to renew his motion for acquittal after the close of the evidence, so we review his sufficiency-of-the-evidence challenges for a manifest miscarriage of justice. *See Price*, 134 F.3d at 350. Huebner contends that there was insufficient evidence at trial to convict him of conspiracy to commit wire fraud and money laundering.

With respect to his conviction for conspiracy to commit wire fraud, 18 U.S.C. § 1343, § 1349, Huebner alleges that there was insufficient evidence to demonstrate that he formed an agreement to commit the crime. *See United States v. Cunningham*, 679 F.3d 355, 373 (6th Cir. 2012) (conviction for conspiracy to commit wire fraud requires the following: the defendant "knowingly and willfully joined in an agreement with at least one other person to commit an act of [wire] fraud and that there was at least one overt act in furtherance of the agreement" (quoting *United States v. Jamieson*, 427 F.3d 394, 402 (6th Cir. 2005). Huebner insists that he simply

7

was a sincere believer in the imminent revaluation of dinar and that, like many people, he was duped by Rudolph Coenen.

However, the record is not devoid of evidence indicating that Huebner conspired to commit wire fraud. The jury easily could have disbelieved Huebner's claims of his sincere belief in Coenen and the revaluation of the dinar. Huebner failed to offer competent evidence at trial supporting his claims that such a revaluation was likely to occur. Instead, Huebner, Emmenecker, and Coenen falsely claimed that, through Executive Order 13303, President George W. Bush expressly endorsed the purchase of dinars. They also assured potential buyers of a fictitious United States statute called the "Overseas Investment Protection Act," which supposedly guaranteed 90% of any investment made in Iraq. With regard to the hedge funds, which were illegal themselves, Huebner and the others told call-in listeners that there were delays due to pending paperwork with the Security Exchange Commission. That was proven to be a complete fabrication. During the raid on Huebner's office, FBI agents discovered dinars stuffed in drawers, cabinets, and even an oven. Based on the foregoing evidence, the jury reasonably concluded that Huebner conspired to commit wire fraud when he participated in the dinar and hedge-fund schemes.

Huebner also challenges the sufficiency of the evidence with respect to his conviction for money laundering, 18 U.S.C. § 1957. Specifically, he contends that the government did not meet its burden of proving his *mens rea* during the time frame designated in the indictment. Huebner's argument, however, rests entirely upon his claims that he was duped by Coenen's lies and was not aware of any fraudulent activity until July 2011 when Karamchani and Varner confronted Huebner with Conen's background. For the reasons stated above, Huebner's argument fails.

C.      **Emmenecker**

Emmenecker contends that the evidence adduced at trial was insufficient to convict him of wire fraud, 18 U.S.C. § 1343, and conspiracy to commit wire fraud, 18 U.S.C. § 1349.  At the close of the government's evidence, Emmenecker made a motion under Federal Rule of Criminal Procedure 29(a) for a judgment of acquittal.  The district court opted to reserve decision pursuant to Rule 29(b), ultimately denying the motion on May 15, 2014.  Emmenecker did not renew the motion but contends that he was not required to, since the district court's ruling on his initial motion came after all of *his* evidence was in.

While a defendant might not be required to take any additional steps when a district court has reserved its ruling until after the close of *all* the evidence, *see United States v. Wagner*, 382 F.3d 598, 611 n.2 (6th Cir. 2004), that is not what occurred in this case.  Emmenecker did not present further evidence after the court's May 15 ruling, but the other defendants presented numerous witnesses on May 16, 2014.  While some of that day's testimony focused on structuring, with which Emmenecker was not charged, other testimony involved the overall dinar scheme.  Since Emmenecker did not renew his Rule 29 motion after the close of proof, our review is limited to determining whether there was a manifest miscarriage of justice.  *See Price*, 134 F.3d at 350.

Emmenecker claims that he simply moderated the group's weekly conference calls because it provided some exposure for himself and Xango, the health drink he was selling.  Other than that, he contends, he profited nothing.  He testified that he and Huebner had been friends for approximately 50 years and that he had purchased over $20,000 in dinars himself.  He further testified that he was an experienced networker and that he appeared on the weekly call-in shows, sharing promotional information that he had heard on previous calls and had seen "written over

and over again" in various sources found in his own research. Emmenecker maintains that, throughout the scheme, he had no reason to doubt the truth of any of the claims the group made about dinars. After the time that Emmenecker stated that he learned the truth about Coenen's deceptions, however, the two continued to appear on call-in shows together. Emmenecker conceded that, by that time, he knew that Coenen was a "bad guy."

The jury could have reasonably disbelieved Emmenecker's claims regarding his sincere beliefs about dinars. Emmenecker concedes that he continued to participate in the weekly calls with Coenen after he knew that Huebner informed the FBI that he suspected Coenen of malfeasance. Emmenecker also testified that in 2010, a concerned client sent him links to websites warning the public that the impending "revaluation" of the dinar was a scam. And while Emmenecker contends that his own misrepresentations (e.g., Executive Order 13303 and the Overseas Investment Protection Act) were immaterial, reasonable individuals could have relied on those representations in deciding whether to purchase dinars. In fact, some of the dinar purchasers who testified at trial stated that they did rely on these types of representations in making their decisions. Accordingly, the record is not devoid of evidence to sustain Emmenecker's convictions for wire fraud and conspiracy to commit wire fraud.

## III.    Restitution Order

The Mandatory Victims Restitution Act ("MVRA") requires those convicted of offenses against property under Title 18 to pay restitution for victims' losses. *United States v. Elson*, 577 F.3d 713, 721 (6th Cir. 2009). We review the amount of restitution ordered by the district court for an abuse of discretion. *United States v. Bogart*, 576 F.3d 565, 569 (6th Cir. 2009). To prove the amount of loss, *see* 18 U.S.C. § 3664(e), the government provided the district court with the names of those who purchased hedge-fund seats, as well as the names of those who purchased

dinars and the amount of U.S. dollars paid. Through questionnaire responses, the government identified 98 individuals who had purchased dinars, estimating that these individuals purchased $344,582 in dinars. The district court applied a 30% assumed-loss rate to account for what the dinars were actually worth, resulting in $103,374.60 in restitution for losses caused by the dinar fraud.

Huebner claims, creatively, that since many of the purchasers do not consider themselves victims, they cannot be recognized as such under the law. He identifies several purchasers who testified at trial to still owning the dinars and believing, or at least hoping, that the speculated revaluation would occur. The Mandatory Victims Restitution Act defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." 18 U.S.C. § 3663A(a)(2). The district court concluded that all 98 identified buyers were victims under the Act, as they were harmed by their purchases of the dinars because the fair market value was substantially less than the amount they paid to Huebner. Reviewing the issue de novo, *see United States v. Chalupnik*, 514 F.3d 748, 752 (8th Cir. 2008), we find that the 98 identified buyers are victims under the MVRA. The Act does not require a victim to have a subjective belief that he or she has been harmed. Rather, it is left to the court to make that determination. We agree with the district court that they are victims, regardless of their subjective beliefs.

Turning to Huebner's second argument, he contends that until purchasers have sold their dinars, they have suffered no actual loss and, thus, there is no basis for awarding restitution. *See United States v. Simpson*, 538 F.3d 459, 465–66 (6th Cir. 2008) (restitution requires finding of actual loss). While some purchasers may still hold their dinars, they have suffered a loss by virtue of the fact that the dinars are worth much less than the price they paid and likely always

11

will be. The Supreme Court's decision in *Robers v. United States*, 134 S. Ct. 1854 (2014), is instructive. A provision of the MVRA states that when return of a victim's property is "impossible, impracticable, or inadequate," the offender must pay the victim "an amount equal to" the property's value less "the value (as of the date the property is returned) of any party of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B). Robers was convicted of conspiracy to commit wire fraud after he submitted fraudulent mortgage loan applications to two banks. *Robers,* 134 S. Ct. at 1856. The banks lent Robers $470,000 to purchase two houses and, when he failed to make loan payments, the banks foreclosed on the mortgages. *Id.* Although the banks took title to the houses in 2006, they were not able to sell them until 2007 and 2008, for a total price of $280,000. *Id.* Robers was subsequently ordered to pay restitution of about $220,000— the rough difference between the $470,000 he was lent and the amount the banks received for selling the houses. *Id.* Like Huebner, Robers argued that, under the current reading of the MVRA, when a victim still holds "collateral" at the time of sentencing, the court would be faced with the dilemma of either refusing to award restitution altogether or giving the victim a windfall. *Id.* at 1858. The Court rejected this argument, pointing out that the provisions of the MVRA allow courts to adjust for various situations. *Id.* That is what the district court did here by making a reasonable estimate of the victims' losses. *See United States v. Jones*, 511 F. App'x 420, 423 (6th Cir. 2013) (citing USSG § 2B1.1 cmt. 3 n.3(C)). This type of reasoned estimate is particularly appropriate in cases "where the losses occasioned by financial frauds are not easy to quantify." *United States v. Triana*, 468 F.3d 308, 320 (6th Cir. 2006).

The district court also ordered Emmenecker to pay $836,124.60 in restitution, joint and several with Coenen and Huebner. This award is comprised of two parts: $103,374.60 for the dinar purchasers' losses and $732,750.00 for losses suffered as a result of the hedge-fund seat

sales. Emmenecker challenges the award, arguing that he should not be held responsible because, unforeseeably to him, Coenen and Huebner spent or otherwise dissipated those funds. Citing his relative level of culpability, Emmenecker asked the district court to apportion his responsibility with respect to restitution at twenty percent. The district court declined to do so, finding that Emmenecker was involved in the wire-fraud conspiracy during its heyday and "fueled the 'dinar hysteria' which eventually led to the fraudulent hedge fund." Regardless of whether he benefitted from the proceeds directly, his actions caused others to lose money, which was the reasonable, foreseeable consequence of participants in a fraudulent scheme. The district court has wide latitude to fashion restitution awards, including imposing joint- and - several-liability, "to best effectuate the [MVRA's] purpose of fully compensating victims." *United States v. Hargrove*, 714 F.3d 371, 377–78 (6th Cir. 2013). The district court did not abuse its discretion with respect to applying joint - and - several liability.

Emmenecker also contends that the district court wrongfully assumed that *every* sale of dinar was fraudulent. He claims that because it is lawful to sell dinar to American citizens, the district court should have reviewed each sale to determine whether that particular sale was fraudulent. We disagree, as we have previously concluded that the government satisfies its burden by a preponderance of the evidence when it extrapolates a total loss amount from a representative group of victims. *See United States v. Jones*, 511 F. App'x 420, 423 (6th Cir. 2013) (explaining that "[a] preponderance of the evidence shows that the 285 bills from the 210 patient files were a representative sample from which the district court could reasonably extrapolate a total loss amount"). While a victim's losses may only be included in a restitution award arising from fraud if the victim actually relied on the perpetrator's fraudulent conduct or misrepresentations, *see United States v. Farano*, 749 F.3d 658, 666 (7th Cir. 2014),

13

Emmenecker has not demonstrated that *any* of the dinar purchasers did not in some way rely on the BH Group's fraudulent marketing or that the district court did not rely on a representative sample of dinar investors when it calculated the loss determination. Thus, the district court did not clearly err in calculating the loss determination.

Finally, Emmenecker takes issue with the district court's decision to average two bids from dinar buyers to determine the fair market value of the dinar. He asserts that the district court should have considered only the higher offer, as would any rational investor. The district court's decision, he continues, unfairly increased the loss amount in the restitution calculation.

Fair market value is discussed in U.S.S.G. § 2B1.1, comment n.3, which states that "[t]he court need only make a reasonable estimate of the loss." We employ a two-step approach in determining fair market value: first, we determine "whether a market value for the stolen property is readily ascertainable," and second, if it is, we "determine whether that figure adequately measures either the harm suffered by the victim or the gain to the perpetrator, whichever is greater." *United States v. Sosebee*, 419 F.3d 451, 456 (6th Cir. 2005). The Supreme Court has said that "even in the ordinary case, assessment of the market value involves the use of assumptions, which make[s] it unlikely that the appraisal will reflect true value with nicety." *United States v. Miller*, 317 U.S. 369, 374 (1943). Indeed, we have determined loss based on the fair market value as "the market price at which an average buyer would purchase the property from an average seller." *United States v. Moore*, 225 F.3d 637, 643 (6th Cir. 2000). The district court's use of averages was not clear error. We conclude that the restitution order is valid.

14

## IV.    Teadt's Claim of Ownership of Seized Dinars

Teadt contends that the district court erred in concluding that he had not met his burden under 21 U.S.C. § 853(n) to establish ownership of dinars seized from Huebner's office on July 27, 2011.  The district court's legal interpretations are reviewed de novo; its factual findings are reviewed for clear error.[3]  *United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009).  During the execution of the search warrant at Huebner's office, agents located 705 dinar notes locked in Teadt's desk.  Agents seized those notes along with others found in the office.  Because the government initially was unsure whether the notes belonged to Teadt or Huebner, the United States sought forfeiture of the notes from both men.  Ultimately, Teadt was acquitted of the dinar and hedge-fund frauds while Huebner was convicted.  The district court found that the seized currency was subject to forfeiture against Huebner.  At that point, Teadt made a third-party claim under § 853(n) for $14,975.96 converted from 17,625,000 dinar notes.  On December 18, 2014, the district court held an evidentiary hearing on Teadt's claim and denied the claim the following day.  The court was not swayed by Teadt's testimony that Huebner's office was a safer place than Teadt's own home to store the dinars.  Teadt's statement contradicted his trial testimony, during which he stated that he deposited cash into a bank instead of keeping it at the BH Group office because the office was not a safe place to keep cash.  Testimony revealed that when an undercover IRS agent purchased dinars from the BH Group, Teadt retrieved the currency from

---

[3] Teadt asserts that the district court erred in shifting the burden of proof to him.  Instead of requiring the government to prove by a preponderance of evidence that the dinars were forfeitable, Teadt claims that the district court erroneously required him to prove *his* claim by a preponderance of the evidence.  The district court did not err.  We have explained that while the government ordinarily must prove forfeiture by a preponderance of the evidence, *United States v. Warshak*, 631 F.3d 266, 331 (6th Cir. 2010), in an ancillary claim, "the burden shifts to the petitioner to establish the petitioner's third-party claim by a preponderance of the evidence," *United States v. Coffman*, 612 F. App'x 278, 284 (6th Cir. 2015) (internal quotation marks omitted).

15

his desk drawer. It is also notable that dinar notes were stashed in drawers and cabinets all around the office. The only documentary evidence that Teadt submitted in support of his claim was checks made out from Teadt to Huebner totaling $9,350.00. Based on the facts of record, the district court did not commit clear error in rejecting Teadt's claim under § 853(n).

## V.    Structuring to Avoid Reporting Requirement Instruction

Huebner was convicted on Counts 13 through 42 of structuring and attempting to structure transactions to avoid reporting requirements under 31 U.S.C. §§ 5313(a) and 5324(a)(3). During his testimony at trial, Huebner conceded that he intentionally deposited cash to avoid making deposits over $10,000. While at times it was a coincidence, he stated, other times, it was done upon the advice of a bank employee to avoid allegedly unnecessary paperwork. Over Huebner's objection, the district court instructed the jury that Huebner could not rely on the bank teller's instructions.

We review challenges to jury instructions for an abuse of discretion. *United States v. Ross*, 502 F.3d 521, 527 (6th Cir. 2007). Further, a judgment may be reversed based upon an improper jury instruction "only if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *United States v. Harrod*, 168 F.3d 887, 892 (6th Cir. 1999) (quoting *Beard v. Norwegian Caribbean Lines*, 900 F.2d 71, 72-73 (6th Cir. 1990)). With respect to structuring, the jury was instructed as follows:

> The government must prove that a given defendant knew of the reporting requirement and that he intended to evade it. The government does not have to prove that a defendant knew that evading the requirement was illegal. A defendant's belief that his conduct was lawful is not a defense to this charge, even if that belief is based on statements made to him by bank employees.

While Huebner argues that the reference to bank employees eviscerated his entire defense to the charges, the district court did not abuse its discretion in choosing to include it. Most

importantly, the court correctly instructed the jury that Huebner had to know of the reporting requirement and intend to evade it. *See United States v. Pang*, 362 F3d 1187, 1193-94 (9th Cir. 2004). Huebner argues that, based on the advice of bank employees, he believed the reporting requirement was an internal bank procedure. He was able to present this evidence through his testimony, however, and was therefore not prejudiced by this instruction. Regardless, Congress has revised the structuring statute "to obviate the need to prove that a defendant knew his structuring activities were illegal." *United States v. Khalife*, 106 F.3d 1300, 1302 n.3 (6th Cir. 1997).

## VI.     Witnesses Admitted As Experts

Teadt complains because the government asked, in the presence of the jury, that its witness, IRS Agent William Massi, be admitted as an expert for his testimony regarding his investigation of Defendants' computers. Upon the government's motion to admit him, defense counsel responded: "No objection." The district court remained silent, and Massi's testimony continued. In *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007), we disapproved of the trial judge's declaration before the jury that the testifying officer was to be considered an expert. We cited to the Eighth Circuit for the proposition that "[s]uch an offer and finding by the Court might influence the jury in its evaluation of the expert and the better procedure is to avoid an acknowledgement of the witnesses' expertise by the Court." *Id.* (quoting *United States v. Bartley*, 855 F.2d 547, 552 (8th Cir. 1988)). Unlike the judge in *Johnson*, however, the trial judge in the case at bar did not make a declaration regarding Massi's qualification as an expert. Rather, he remained silent in the face of defense counsel's acquiescence and Massi's testimony continued. Indeed, counsel should refrain from asking the court to approve a witness as an expert in the presence of the jury. *See id.* And in the absence of ruling on an objection, the court

should not, in the presence of the jury, make a determination as to whether a witness is qualified as an expert. *Id.* at 698 (citing *ABA Civil Trial Practice Standard* 17 (Feb. 1998)); *see also United States v. Trepanier*, 576 F. App'x 531, 536 (6th Cir. 2014).

In any event, plain error has not occurred. Subsequent to the events described above, Teadt's attorney moved the court, in the presence of the jury, to designate Richard Green, Defendants' computer witness, as an expert. The government stated that it had no objection and, just he had done previously, the trial judge remained silent. Any implicit bias created by the trial court's acceptance of Massi as an expert was neutralized by its acceptance of Green as a defense expert on the same subject matter.

## VII. Prosecutorial and Juror Misconduct

Defendants Emmenecker and Teadt argue that the prosecutor made inappropriate statements during closing arguments, but since Defendants did not challenge these statements below, we review them only for plain error. *United States v. Koeberlein*, 161 F.3d 946, 948–49 (6th Cir. 1998). Both Defendants suggest that the prosecutor improperly referred to evidence that existed, but was not in the record by telling the jury "I wish we could show cash deposits into Mr. Emmenecker and Mr. Teadt's accounts that we could say was how they profited." When the statement is viewed in context, however, it is clear that the prosecutor was merely conceding that the government had no direct evidence of how Teadt or Emmenecker benefitted monetarily from the crimes.

Emmenecker takes issue with a number of other minor statements by the prosecutor. A thorough review of the trial transcript reveals that these statements fall within the range of discretion given to prosecutors during closing arguments. *See United States v. al-Maliki*, 787 F.3d 784, 795 (6th Cir. 2015).

Finally, the district court did not plainly err in dealing with the issue of sleeping jurors. *See United States v. Maxwell*, 160 F.3d 1071, 1076-77 (6th Cir. 1998). One juror who was having difficulty remaining awake was dismissed as an alternate at the conclusion of trial. The judge also reminded the jurors repeatedly that he was observing them, assessing their level of alertness, and "tak[ing] actions to wake up the situation." A district judge has "considerable discretion in deciding how to handle a sleeping juror and overturning the verdict is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury." *United States v. Cook*, 550 F. App'x 265, 270 (6th Cir. 2014) (internal quotation marks removed). On this record, we cannot find such a deprivation of rights.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is **AFFIRMED.**