NOT RECOMMENDED FOR PUBLICATION
File Name: 15a0353n.06

Nos. 14-5134/14-5298

FILED
May 11, 2015
DEBORAH S. HUNT, Clerk

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRYAN COFFMAN, | ) | **ON APPEAL FROM THE** |
| | ) | **UNITED STATES DISTRICT** |
| Defendant, | ) | **COURT FOR THE EASTERN** |
| | ) | **DISTRICT OF KENTUCKY** |
| | ) | |
| BANIEL, LLC; DACORTA, LLC; MEGAN | ) | |
| COFFMAN, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

BEFORE:    GUY, BATCHELDER, and MOORE, Circuit Judges

    **ALICE M. BATCHELDER, Circuit Judge.**  In 2011, a jury convicted Bryan Coffman of various counts of fraud and money laundering.  The same jury acquitted his wife, Megan Coffman, of several counts of money laundering.  During the investigation leading up to trial, the government sought to divest Bryan of the proceeds of his money-laundering scheme as well as other assets used to shield the money laundering.  Following the guilty verdict, the district court issued a preliminary order of forfeiture that included property to which Megan Coffman and two of her LLCs, the appellants in this case, lay claim.  Pursuant to 21 U.S.C. § 853(n), Appellants petitioned the district court for an ancillary hearing, which the district court duly held.  Although

the district court ruled in Appellants' favor on a few issues, it included in the final order of forfeiture against Bryan the vast majority of what Appellants claim is their property. Appellants now challenge the final order of forfeiture. For the reasons that follow, we AFFIRM the order.

**I.**

We discussed at length the underlying case against Bryan Coffman and his business partner, Gary Milby, in our disposition of Bryan's appeal of his conviction. *See United States v. Coffman*, 574 F. App'x 541 (6th Cir. 2014). To summarize, during a five-year period beginning in 2004, Bryan and Milby defrauded almost 600 investors out of over thirty-six million dollars through a complex scheme involving shell companies and securities in Kentucky oil wells. Bryan and Milby used forty-two bank accounts in perpetrating the fraud. Bryan also funneled investors' money through several bank accounts into an investment account he held with his wife Megan, and he later transferred his interest in the investment account to Megan. He further funneled that money into Megan's companies' accounts, and purchased with it a condominium where his sister-in-law lived, and a yacht which became the property of one of Megan's companies.

Pursuant to a Securities and Exchange Commission investigation, Bryan received a subpoena for his bank account and other financial records in June 2008. Meanwhile, the federal government continued its investigation of Bryan, Milby, and Megan. In December 2008, the government filed a complaint for civil forfeiture *in rem* against the Coffmans and Milby pursuant to 18 U.S.C. § 981(a)(1)(A) and (C) and 18 U.S.C. §§ 983 and 985, designating for forfeiture the funds in thirteen bank accounts, one yacht, one condominium, and the Coffman family home. The government then petitioned for, and the district court granted, a stay in the civil case pending any criminal action. In 2009, a federal grand jury indicted Bryan and Milby for mail fraud, wire

fraud, securities fraud, and money laundering, and also indicted Megan for money laundering. As part of the indictment, the government sought through criminal forfeiture from Bryan under 18 U.S.C. § 981(a)(1)(C) a total of approximately thirty-three million dollars, designating the funds in the thirteen bank accounts, the yacht, the condominium, and the Coffman family home as potentially forfeitable, and nine pieces of real property as potential substitute assets if the other property did not satisfy the thirty-three million dollar sum. In a separate forfeiture allegation in the indictment that named both Bryan and Megan, the government sought forfeiture of "any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the specific property (financial institution accounts, real property) as referenced above." The case then proceeded to trial.

In 2011, the federal jury found Bryan and Milby guilty of almost all the counts against them. The same jury acquitted Megan of the money laundering charges against her. Because the parties elected to have the district judge determine the forfeiture issue rather than submit it to the jury, the district court consolidated the criminal action and the civil forfeiture action, noting that the final order of forfeiture in the criminal action would dispose of the civil action as well. On April 19, 2012, the district court entered a joint-and-several judgment against Bryan and Milby for thirty-three million dollars, which represented the approximate amount of proceeds derived from their scheme. Pursuant to that judgment, the district court adopted a preliminary order of forfeiture of the funds in the thirteen bank accounts, the condominium, and the yacht. Because the monetary value of the property in the preliminary order totaled only about three million dollars, the government petitioned the district court to amend its preliminary order and add to that order two automobiles and eight pieces of real property as substitute property. Over Bryan's objections, the district court granted the government's motion and included in its last preliminary

order of forfeiture the funds in the thirteen bank accounts, the condominium, the yacht, the two automobiles, and the eight pieces of real property.

Megan Coffman and two companies of which she is sole proprietor filed petitions for ancillary hearings under 21 U.S.C. § 853(n) in order to assert their interests in some of the forfeited property. Megan claimed ownership of the eight pieces of real property and at least part of the funds in nine of the bank accounts; Dacorta LLC ("Dacorta") claimed ownership of at least part of the funds in two of the bank accounts; and Baniel, LLC ("Baniel") claimed ownership of the yacht. In March 2013, the district court held a two-day ancillary proceeding to determine whether Megan or the two companies had a superior interest to that of the government in any of the property. In January 2014, the district court released an opinion, determining that Megan had proven a superior right to approximately $300,000 and her interest in the joint tenancies that held the eight pieces of real property. Pursuant to this opinion, the district court included in its final order of forfeiture most of the funds in the thirteen bank accounts, the yacht, the two automobiles, and Bryan's interest in the eight pieces of real property. Because of the consolidation of the cases, the final order of forfeiture in the criminal case served as the final order of forfeiture in the civil case as well.

Megan and her two companies appeal the final order of forfeiture in both the criminal action and the civil action. We have consolidated the criminal case and the civil case for purposes of appeal.

## II.

Before we begin, some background on the criminal forfeiture procedures, specifically in this particular context, will be helpful. The government sought forfeiture of the bank account funds and the yacht under both 18 U.S.C. § 981 ("civil forfeiture") and 18 U.S.C. § 982

("criminal forfeiture") because civil forfeiture provisions are fully applicable in the criminal forfeiture context. *See* 21 U.S.C. § 853(j).[1] First, 18 U.S.C. § 981(a)(1)(C) authorizes the forfeiture of any property "which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as defined in 18 U.S.C. § 1956(c)(7). Mail and wire fraud are "specified unlawful activities." *See* 18 U.S.C. § 1956(c)(7)(A) (designating as a "specified unlawful activity" any act constituting an offense "listed in section 1961(1) of this title"); *id.* § 1961(1) (listing mail fraud and wire fraud). Thus, any proceeds of the fraud are forfeitable. Second, 18 U.S.C. § 982(a)(1) further authorizes the forfeiture of any property "involved in" or "traceable to" the underlying criminal prosecution. The crux of the government's forfeiture argument is that any money directly traceable to investors is forfeitable as proceeds of the fraud. The remaining money in the bank accounts, and the yacht if purchased with this remaining money, are forfeitable as property "involved in" the money laundering.

Because the district court entered a judgment for thirty-three million dollars but only three million of it could be found, the government was entitled to petition the court for the inclusion of substitute property. 21 U.S.C. § 853(p). Once the district court identified the property the government sought, it submitted a preliminary order of forfeiture listing the property subject to forfeiture, "without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b)(2)(A). Following entry of the preliminary order of forfeiture, the government published the required notice of the order in order to determine whether there were any third-party claims to the proposed forfeitable property. 21 U.S.C. § 853(n)(1). Any third party may petition the court for a hearing to adjudicate the validity of his alleged interest in the property. *Id.* § 853(n)(2). If the court determines at the hearing that the petitioner has established his

---

[1]According to 18 U.S.C. § 982(b)(1), the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. § 853) governs this proceeding. Federal Rule of Criminal Procedure 32.2 also applies, because it contains provisions for ancillary proceedings "prescribed by statute." Fed. R. Crim. P. 32.2(c)(1).

interest, by showing either a superior interest in the property or that he was a bona fide purchaser of the property, the court must amend its order of forfeiture in accordance with that determination. *Id.* § 853(n)(6). Regardless of the outcome of the ancillary proceeding, "[w]hen the ancillary proceeding ends, the court must enter a final order of forfeiture." Fed. R. Crim. P. 32.2(c)(2). It is this final order of forfeiture that Megan, Baniel, and Dacorta are appealing.

With this background in mind, our first task is to determine which of Appellants' challenges are properly before us. Appellants' entire first assignment of error, and several portions of their other assignments of error, are direct challenges to the preliminary order of forfeiture, claiming that the district court erred by designating certain property as forfeitable in the first instance. Recently, however, we held that third parties lack standing to challenge the preliminary order of forfeiture because "[b]y its plain terms . . . § 853(n) does not permit 'relitigation' of the district court's antecedent determination that an item of property is subject to forfeiture." *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014). Instead, § 853(n) "allows a third party to obtain relief on only two grounds: first, that its interest in forfeitable property 'was superior' to the defendant's interest in the property 'at the time of the commission of the acts which give rise to the forfeiture'; or second, that the third party was a 'bona fide purchaser for value[.]'" *Id.* Appellants have made several claims that comport with § 853(n), and those claims are properly before us. To the extent that they are challenging the district court's decision to include in the preliminary order of forfeiture certain property to which they lay claim, however, they lack standing. *See id.* ("Thus, like every circuit to have reached the issue, we hold that third parties lack statutory standing to challenge a district court's determination, in a preliminary order entered under Criminal Rule 32.2(b)(2), that certain property is subject to forfeiture.").

But, Appellants contend, someone must be able to contest the basis for the initial forfeiture of the property. This is true. Bryan was able; and he did. During the preliminary order phase, the government must establish "the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). The district court determined that the government met its burden as to the funds in the thirteen bank accounts, the yacht, the condominium, the two automobiles, and the eight pieces of real property. Bryan challenged this determination, and we upheld it on appeal. *See Coffman*, 574 F. App'x at 561–64. We fully considered all of his arguments about the preliminary order of forfeiture, except one. We refused to entertain any argument on Appellants' behalf, stating that he "cannot assert a third party's interest in substitute property in a direct challenge to a preliminary forfeiture order." *Id.* at 563. We did this because an ancillary proceeding under § 853(n) is "the sole avenue for a third party to assert an interest in forfeitable property." *United States v. Erpenbeck*, 682 F.3d 472, 480 (6th Cir. 2012) (emphasis omitted). This is not a "shell game," *see United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011), as Appellants contend. Rather, Bryan had a full and fair opportunity to litigate the basis for the initial forfeiture, save that he could not raise third-party interests. Appellants now have the chance to raise those third-party interests. In fact, in an ancillary proceeding, Appellants can raise *only* those third-party interests. *See United States v. Huntington Nat. Bank*, 574 F.3d 329, 334 (6th Cir. 2009) ("Because § 853(n)(6) offers just two grounds for relief, only two (closely related) substantive questions may arise when a third party asserts an interest in forfeitable property.").

## II.

Having determined that Appellants can raise only their third-party-interest challenges in an ancillary proceeding, we continue on with their assignments of error. In their second

contention on appeal, they argue that the district court erroneously required them to demonstrate the innocent source of the funds to which they lay claim. They specifically argue that the district court improperly excused the government from its burden of demonstrating forfeitability and shifted the burden of proof to them. Their contention, however, rests on a misapprehension of the burden of proof in these ancillary proceedings.

Appellants are correct that "[t]he government must prove forfeiture by a preponderance of the evidence." *United States v. Jones*, 502 F.3d 388, 391 (6th Cir. 2007). During the preliminary order phrase, the government bears the burden of proof in establishing "the requisite nexus between the property and the offense." Fed. R. Crim. P. 32.2(b)(1)(A). During an ancillary proceeding, however, the burden shifts to the petitioner to establish "the petitioner's third-party claim by a preponderance of the evidence." *United States v. Salti*, 579 F.3d 656, 661 (6th Cir. 2009). As our sister circuit has noted, "Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden of proving that the defendant's interest in the property was subject to forfeiture during the criminal trial." *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001), *superseded on other grounds as recognized in United States v. Marion*, 562 F.3d 1330 (11th Cir. 2009). Appellants' contention that the district court improperly shifted the burden of proof in the ancillary proceeding is mistaken. The burden of proof properly belonged to the Appellants throughout that proceeding.

To the extent that Appellants are contending that the government did not meet its burden of proof in the preliminary order of forfeiture against Bryan, they lack standing to make this claim. Just as they cannot challenge the property's inclusion in the preliminary order, they cannot challenge the government's success in carrying its burden of furnishing its proposed list

of forfeitable property. That challenge was Bryan's to raise, and he did, in fact, raise it. *See Coffman*, 574 F. App'x at 561.

## III.

Having noted that Appellants cannot challenge the preliminary order of forfeiture, that they maintained the burden of proof throughout the ancillary proceeding, and that they may raise only claims about their interests in the forfeitable property, we move on to those claims. Megan and Dacorta contend that even if they had the burden of proof at the ancillary proceeding, they met their burden by showing that they exercised complete control over the bank account funds in question. We review *de novo* the district court's interpretation of federal forfeiture laws. *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001). The district court's findings of facts, on the other hand, we review for clear error. *United States v. Smith*, 749 F.3d 465, 488 (6th Cir. 2014).

As mentioned, the government pursued the forfeiture of the bank account funds under two different statutory provisions. First, it sought the actual investor funds as proceeds of the fraud under 18 U.S.C. § 981(a)(1)(C). Second, it sought the remainder of the funds in the accounts as property "involved in" the money laundering under 18 U.S.C. § 982(a)(1). These two statutory provisions carry with them different rules and standards. For instance, the requirement, on which the district court relied heavily, that an individual show the innocent source of funds is relevant only in the proceeds context. The Seventh Circuit has held that "[p]robable cause to believe that the proceeds of the fraud exceed the balance of the account at the time of seizure justifies calling on the claimant to identify sums derived from lawful activities." *United States v. $448,342.85*, 969 F.2d 474, 477 (7th Cir. 1992). A petitioner can recover funds by demonstrating their innocent source because, in the context of proceeds, "the

presence of one illegal dollar in an account does not taint the rest—as if the dollar obtained from fraud were like a drop of ink falling into a glass of water." *Id.* at 476.

That same requirement, however, does not apply in the context of property "involved in" the money laundering under § 982(a)(1). "Property under [this] statute includes the money or other property being laundered (the corpus), any commissions or fees paid to the launderer, and any property used to facilitate the laundering offense." *United States v. Puche*, 350 F.3d 1137, 1153 (11th Cir. 2003) (internal citations and quotation marks omitted). "Facilitation occurs when the property makes the prohibited conduct less difficult or more or less free from obstruction or hindrance." *Id.* Thus, "even legitimate funds that are commingled with illegitimate funds can be forfeited if the legitimate funds were somehow involved in the offense, such as by helping to conceal the illegal funds." *United States v. Baker*, 227 F.3d 955, 970 n.4 (7th Cir. 2000). It is not relevant to the forfeitability analysis in the "involved in" context whether or not funds are "innocent"; *any* so-called facilitation funds—innocent or not—are forfeitable if they are found to have aided in concealing the money laundering.[2]

After the court issues a preliminary order of forfeiture, if no third party requests an ancillary proceeding, "the preliminary order becomes the final order of forfeiture." Fed. R. Crim. P. 32.2(c)(2). And the government owns the forfeitable property from the moment of the commission of the offenses, found in the so-called relation-back clause: "All right, title and interest" in forfeitable property "vests in the United States upon the commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c). Thus, "[a]fter the commission of the criminal acts, title to forfeitable property, by operation of the relation-back clause, actually belongs to the government." *United States v. Harris*, 246 F.3d 566, 575 (6th Cir. 2001) (quoting *United States*

---

[2] The district court ordered that certain funds should be removed from the final order of forfeiture because Appellants had proven an innocent source of those funds. Although this determination is inconsistent with our holding here, the government did not appeal that order, and we do not address it here.

*v. Lavin*, 942 F.2d 177, 186 (3rd Cir. 1991)). In fact, the statute provides only two exceptions to this relation-back principle: if, at an ancillary proceeding, the petitioner shows that his interest in the property was superior to the defendant's (now government's) interest or that he was a bona fide purchaser for value. 21 U.S.C. § 853(n)(6).

To summarize, under the relation-back clause, the government steps into the shoes of the defendant as to any forfeitable property from the point of the commission of the money laundering. When the government has pursued funds as being "involved in" the money laundering, once the preliminary order of forfeiture is issued, the government obtains an interest in all forfeited funds—innocent or otherwise—retroactive to the day the money laundering began. At the ancillary proceeding, then, the burden is on the petitioner to prove that he has an interest superior to that of the government, or that he is a bona fide purchaser for value. If the petitioner cannot show one of these two things, then the property is forfeited to the government.

Appellants are correct in their contention that they do not need to demonstrate the innocent source of all the monies that are admittedly not proceeds of the fraud. But this does not help them because the "innocent" funds were forfeited under the theory that they were "involved in" the money laundering by helping to conceal the crime. And although Appellants admit that they have no legal interest in the proceeds, they do argue that they have a superior interest in the facilitation funds. Their argument boils down to their belief that because the name "Megan Coffman" or "Dacorta" is on the bank accounts, they have shown a superior interest. Bare legal title, however, "in the absence of assertions of dominion, control or some other indicia of ownership of or interest in the seized property, is insufficient to confer standing to challenge a forfeiture." *United States v. $515,060.42*, 152 F.3d 491, 498 n.6 (6th Cir. 1998). This is so because "people engaged in illegal activities often attempt to disguise their interests in property

by placing title in someone else's name . . . . In short, courts look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings of someone else." *United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001) (internal quotation marks and citation omitted).

Neither Megan nor Dacorta has carried the burden of proving that they asserted primary dominion or control over the funds in the accounts. In its preliminary order of forfeiture, which Appellants cannot challenge, the district court found that the funds were forfeitable in their entirety. The onus is on Megan and Dacorta to prove by a preponderance of the evidence that they asserted dominion or control over the accounts. They have not done so. Of the roughly three million dollars in the bank accounts, about half is directly traceable to the fraud as proceeds. This means that Bryan was able to launder almost one and a half million dollars through accounts Appellants claim to have controlled.

Appellants' lack of control is evident in various statements Megan made during the ancillary proceeding. For instance, when asked why her husband gave her a check for $100,000 to deposit into an account, she postulated that he was simply feeling "very happy and generous at the time." Further, when Bryan asked her to write him a check for $600,000 while leaving the payee line blank, Megan complied without hesitation. And when Bryan transferred his interest in their joint financial account to her for "estate planning" purposes, she accepted his purported estate-planning expertise unquestioningly. Megan's testimony shows that Bryan had primary control of the money coming into the accounts, the money when it was in the accounts, and the money going out of the accounts. Indeed, the clearest proof that Bryan was actually in control of the financial accounts is that, as the district court noted, Bryan was convicted of money laundering based on charges rooted in all these accounts, whereas Megan was acquitted.

Appellants provided no convincing evidence to the contrary. In fact, all of the accounts were created after the fraud began and also after the civil action against Mid-America had been initiated. We agree with the district court that it is at least more likely than not that these accounts were created in order to conceal Bryan's money laundering.

Appellants have not demonstrated a superior interest in the funds, because Bryan exercised dominion and control over them. The district court did not err by including the funds in its final order of forfeiture.

**IV.**

Baniel challenges the district court's including in the final order of forfeiture a yacht titled in its name. Rather than relying on a superior interest, Baniel claims that it is a bona fide purchaser for value. "This *bona fide* purchaser exception protects a third party who acquires a legal interest in property for value *after* the acts giving rise to the forfeiture have occurred and who had no reason to believe that the property was subject to forfeiture." *United States v. Huntington Nat. Bank*, 682 F.3d 429, 433 (6th Cir. 2012) (emphasis in original). The relevant inquiry is not whether the petitioner *actually* believed that the property was subject to forfeiture, but whether the petitioner "was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B).

Baniel has not met its burden of proving by a preponderance of the evidence that it was reasonably without cause to believe that the yacht was subject to forfeiture. Megan, on behalf of Baniel, paid $900,000 cash for the yacht. Of that money, $450,000 is admittedly from investor funds. The only way that Baniel would be a bona fide purchaser for value, then, is if it was reasonably without cause to believe that that money was not subject to forfeiture as proceeds of the fraud. At the ancillary proceeding, Megan recounted how she obtained the $450,000 in

investor funds. Sometime in July 2008, Bryan came home one day and asked her for a $600,000 loan which he said he would pay back right away. He never said where the money was going, and Megan never asked. Bryan further told her to leave the payee line of the check blank, an instruction Megan followed without hesitation. Four days later, Bryan repaid $460,000 of the $600,000 loan out of investor funds. Megan then used that money as half of the down payment for the yacht, on behalf of Baniel.

Baniel bought the yacht on August 1, 2008. But in 2007, the SEC was already investigating Milby. Bryan was served with a subpoena for his financial records in connection with the SEC investigation in June 2008. Further, throughout 2008 Bryan had transferred many properties the couple had held jointly solely into Megan's possession. Given the red flags around Bryan's financial status in August 2008, Baniel has not shown by preponderance that it was reasonably without cause to believe that the money was not proceeds of the fraud. Baniel was thus not a bona fide purchaser for value, and the district court did not err by including the yacht in its final order of forfeiture.

## V.

Megan further challenges the district court's inclusion of Bryan's interest in eight properties determined by the court to be held in tenancies by the entirety. At the time of the forfeiture, three of the properties were held in tenancies by the entirety, whereas the other five were ostensibly held solely in Megan's name. These five properties, however, had been held in tenancies by the entirety until December 2007, at which point Bryan transferred his interest in them to Megan by quit-claim deeds. The government claims that Bryan's interests in all eight properties are forfeitable because the December 2007 transfers were fraudulent. Again, because

all eight properties were included in the preliminary order of forfeiture, the onus is on Megan to prove that the transfers were not fraudulent.

The eight pieces of real property were included in the preliminary order of forfeiture as substitute assets. 21 U.S.C. § 853(p) allows for the forfeiture of substitute property if the actual property subject to forfeiture cannot be fully located upon the exercise of due diligence. Because the judgment against Bryan was almost thirty-three million dollars, but the property subject to forfeiture did not reach this amount, the government sought these pieces of real property as substitute assets toward its judgment. That being said, substitute property must be "property of the defendant." *Id.* § (p)(2). Megan's claim, therefore, is that she has a superior interest in the five pieces of real estate which had been transferred solely into her name and so the real properties were improperly forfeited, namely because they were no longer the property of Bryan.

Her challenge is primarily premised on her contention that fraudulent conveyance law is inapplicable to federal forfeiture proceedings. Federal courts, however, have used fraudulent conveyance statutes in forfeiture proceedings. *See, e.g.*, *United States v. Frykholm*, 362 F.3d 413, 417 (7th Cir. 2004) (applying Wisconsin fraudulent conveyance law). In fact, federal courts *must* apply these statutes if applicable, because "[s]tate law defines and classifies property interests for purposes of the forfeiture statutes, while federal law determines the effect of the property interest on the claimant's standing." *United States v. Salti*, 579 F.3d 656, 669 (6th Cir. 2009) (quoting *United States v. 5 S 351 Tuthill Road, Naperville, Ill.*, 233 F.3d 1017, 1021 (7th Cir. 2001)).

Kentucky law provides that "[e]very gift, conveyance, assignment or transfer of, or charge upon, any estate, real or personal . . . made with the intent to delay, hinder or defraud creditors, purchasers or other persons . . . shall be void as against such creditors, purchasers, and

other persons." Ky. Rev. Stat. Ann. § 378.010. "Between persons closely related, such as husband and wife, the transaction must be closely examined to see that no subterfuge is employed." *Hayes v. Rodgers*, 447 S.W.2d 597, 600 (Ky. 1969). "When such a transaction is exposed to scrutiny, the burden is always upon the recipient of the property acquired to show that the conveyance was fairly made and not tainted with an intent to accomplish a fraudulent purpose." *Bolling v. Adams*, 296 S.W.2d 696, 699 (Ky. 1956). Badges of fraud often accompany fraudulent purposes. "A transfer between two related parties is typically a badge of fraud." *Jadco Enter., Inc. v. Fannon*, 991 F. Supp. 2d 947, 951 (E.D. Ky. 2014) (applying Kentucky law). "When a conveyance is attended with badges of fraud, the burden of proving good faith shifts to the one defending its integrity; and when that status has been reached, the grantee's failure to produce available explanatory evidence becomes in itself an additional badge of fraud." *Jones v. Jones*, 71 S.W.2d 999, 1004 (Ky. 1934).

The December 2007 transfers were transfers between two related parties. Megan is wholly unable to produce explanatory evidence as to why the transfers took place. And although Megan claims the transfers were done to equalize their estates for estate-planning purposes, she offered no evidence during the ancillary proceeding that these transfers would have helped balance the couple's estates. For the first time, on appeal, she included some provisions of the tax code in her brief's addendum in order to show the benefit of the transfers, but that information was not introduced in the district court at the ancillary proceeding, and we will not consider it. On the other hand, the government introduced evidence from Bryan's paralegal that Bryan was concerned about someone's suing him and coming after his personal assets, so he planned to transfer his property to his wife.[3] In sum, Megan is not able to show a superior

---

[3] Although Appellants contend that this statement was hearsay, the district court admitted the statement during the ancillary proceeding and Appellants do not challenge that decision on appeal as an evidentiary violation.

interest in the property by showing that the transfers were not fraudulent. At the time of the forfeiture, therefore, all eight properties were held jointly by Bryan and Megan. The district court thus did not err by including Bryan's interest in all eight pieces of real property in the final order of forfeiture.

## VI.

Appellants also raise some broader constitutional claims regarding the ancillary proceeding and the final order of forfeiture. First, they contend that the forfeiture proceedings subjected Megan to double jeopardy and violated Appellants' Eighth Amendment rights. Having been acquitted of the money laundering charges against her, Megan argues that the forfeiture of hundreds of thousands of dollars of her assets constitutes a successive prosecution and punishment. This contention is meritless. Even assuming the assets in question were hers, double jeopardy would not apply because this forfeiture proceeding is a component of Bryan's sentence, not her prosecution and acquittal. Megan voluntarily entered the forfeiture proceeding by petitioning for an ancillary hearing. This voluntary participation exposes the contradiction in her assertion that she was successively prosecuted through the ancillary proceeding. Further, as we have already explained, Bryan asserted dominion and control over the assets, and because the conveyances were fraudulent, maintained an interest in the real properties. Therefore, the district court did not forfeit thousands of dollars of *Megan*'s assets.

Appellants' Eighth Amendment claim of violation of the Excessive Fines Clause fails for similar reasons. Megan was not facing another prosecution, and thus she did not face the possibility of a fine. Instead, Appellants inserted themselves into Bryan's forfeiture proceedings in order to claim an interest in some of the property. They cannot now, after having intervened in the proceedings, claim that the order of forfeiture operates as a fine, even if they eventually

lose what they believe are their assets.  The ancillary proceeding did not subject Megan to double jeopardy or Appellants to excessive fines.

**VII.**

Appellants further contend that the district court violated their due process rights by delaying the adjudication of their claims for nearly four and a half years—from their property's initial seizure in late 2008 to the ancillary hearing in March 2013.  This circuit weighs four factors in assessing whether delay in bringing a forfeiture action violates due process: "the length of the delay, the reason for the delay, the claimant's assertion of his right, and the prejudice to the claimant."  *United States v. Ninety Three Firearms*, 330 F.3d 414, 424–25 (6th Cir. 2003) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)); *see also United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1163 (2d Cir. 1986) (applying *Barker* framework to holding of the forfeiture trial as well as to the filing of the action).  "The length of the delay is to some extent a triggering mechanism.  Until there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance."  *Barker*, 407 U.S. at 530.  Assuming *arguendo* that four and a half years is presumptively prejudicial, Appellants' claim fails on each of the other three factors.

The government has provided a persuasive reason for the delay.  Although the civil forfeiture complaint was filed in 2008, the government petitioned almost immediately for a stay of the case pending any criminal action.  The criminal action was initiated in December 2009 and was not completed until the jury verdict in May 2011.  As the Supreme Court has noted, pending criminal proceedings can justify delay in instituting civil forfeiture proceedings.  *United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 567 (1983).  The remaining time can be attributed to the judicial process at work.  In July 2011, the government moved for a preliminary order of

forfeiture. In September 2011, the court took the matter under advisement. In April 2012, the court issued its preliminary order of forfeiture. Soon after, Appellants petitioned for an ancillary hearing. In June 2012, the district court allowed discovery on the ancillary hearing issues. In January 2013, the parties filed motions for summary judgment. The district court subsequently rejected the motions for summary judgment and scheduled the ancillary hearing for March 2013. After conducting the ancillary hearing in March 2013, the court issued its opinion in January 2014. Given the complex nature of the claims in this case, the ongoing appeals by parties involved, and the amount of time needed for many of these steps, we do not believe that the reason for the delay was improper.

The third factor is the claimant's assertion of his right. Here, Appellants asserted their rights almost immediately after the court issued its preliminary order of forfeiture in April 2012. This, however, shows a weakness in Appellants' argument. Although the forfeiture proceedings can be traced back to 2008, Appellants' role in the proceedings did not arise until 2012. While we understand Appellants' frustration with having to wait for the criminal case to end and the preliminary order of forfeiture to be released, "we are readily satisfied that the system set out in § 853 provides them with due process." *United States v. Holy Land Found. for Relief and Dev.*, 493 F.3d 469, 478 (5th Cir. 2007).

This conclusion is further bolstered by the fact that Appellants have shown no prejudice from the delay. "The primary inquiry here is whether the delay has hampered the claimant in presenting a defense on the merits, through, for example, the loss of witnesses or other important evidence." *$8,850*, 461 U.S. at 569. Appellants have failed to provide any evidence of how the delay has prejudiced them. Accordingly, we must conclude that no such prejudice exists.

Weighing the four factors, we hold that Appellants were not denied due process by the supposed delay in the proceedings. Although the ancillary proceeding was held almost four and a half years after the filing of the initial forfeiture complaint, the intervening criminal trial and appeals necessitated much of the delay.

## VIII.

Appellants' final contention is that the district court erred by entering a final order of forfeiture without addressing their civil forfeiture claims. Their argument is premised on the belief that their claims should be granted under the civil forfeiture "innocent owner" defense of 18 U.S.C. § 983(d). However, as they note in their brief, in its final order of forfeiture, the district court implicitly rejected their claim that they were innocent owners. Finding no error in the district court's factual determinations and ultimate conclusions, we find no error in the district court's issuing of one order of forfeiture to terminate both the criminal and civil forfeiture actions.

## IX.

For the foregoing reasons, we AFFIRM the district court's final order of forfeiture as to Megan Coffman, Baniel, and Dacorta.