NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0246n.06

No. 14-3047

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **FILED** |
| Plaintiff – Appellee, | ) | May 09, 2016 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| THOMAS E. PARENTEAU, et al., | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| Defendants, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| and | ) | |
| | ) | |
| JEFFREY S. PARENTEAU, | ) | |
| | ) | |
| Interested Party – Appellant. | ) | |

BEFORE: ROGERS and WHITE, Circuit Judges; HOOD, District Judge.*

ROGERS, Circuit Judge. In a number of cases in this circuit, courts have been tasked with sorting through the repercussions of a complex bank fraud and money-laundering scheme orchestrated by Thomas Parenteau,[1] an Ohio homebuilder. This iteration involves a 21 U.S.C. § 853(n) petition by Jeffrey Parenteau to amend the forfeiture order in the criminal case against Thomas, who is Jeffrey's stepfather. Thomas was convicted in 2010 of multiple charges related to bank fraud, wire fraud, and money laundering. In the forfeiture portion of Thomas's sentencing, he was ordered to forfeit to the Government his interest in four life-insurance

---

* The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation.

[1] Because five of the individuals relevant to this case share the same last name, this opinion uses first names for those individuals.

policies (on the life of Thomas's father). Those policies, which were owned by Thomas's company and were integral to his crimes, each provided approximately $5 million in coverage. After sentencing, Jeffrey petitioned to amend the forfeiture order, arguing that he was entitled to $957,177 in the insurance policies by virtue of a January 2009 assignment in that amount from Thomas's company. Section 853(n), however, requires a petitioner to prove that at the time of purchase, he was reasonably without cause to believe that the interest he received was subject to forfeiture. Because Jeffrey did not do so, his petition was properly dismissed.

As an initial matter, some of the facts in Thomas's criminal case are relevant to this petition.[2] Thomas owned several construction companies involved in the luxury-home business, including MKP Investments, LLC (MKP). In 2002 and 2003, Thomas purchased four key-man insurance policies that covered the life of his father, Roger Parenteau, who passed away in 2009. MKP was the owner and beneficiary of the policies. Thomas's criminal activity began in the early 2000s, when he and his co-conspirators began making fraudulent statements on tax returns in order to receive significant refunds. *United States v. Parenteau*, 529 F. App'x 532, 533 (6th Cir. 2013). Over the next few years, the conspirators filed several fraudulent loan applications with lenders and obtained large loans against the houses that served as collateral. *Id.* Thomas sold luxury houses at above-market prices, as well, and gave kickbacks to the buyers in the process. *Id.* at 534. On September 16, 2008, Thomas was indicted by a federal grand jury on obstruction-of-justice and witness-tampering charges. A superseding indictment in April 2009 covered Thomas's other crimes, including tax conspiracy, money laundering and money-laundering conspiracy, and bank and wire fraud conspiracy. The indictment also included a forfeiture count.

---

[2] We have previously affirmed Thomas's conviction and the sentence of Marsha Parenteau, who is Jeffrey's mother and Thomas's wife. *See United States v. Parenteau*, 529 F. App'x 532, 536 (6th Cir. 2013) (Thomas's conviction); *United States v. Parenteau*, 506 F. App'x 430, 435 (6th Cir. 2012) (Marsha's sentence).

Thomas was convicted of multiple charges in 2010, and sentenced in 2011.[3] As part of the sentence, the district court held that Thomas had forfeited his interest in the four insurance policies under 18 U.S.C. § 982(a)(1), a forfeiture statute that covers property with a certain nexus to a money-laundering violation. The policies were involved in money laundering, the district court held, because Thomas used the proceeds of the loan fraud to pay the insurance premiums and because Thomas listed the policies as his largest assets on several of the loan applications.

During the time leading up to Thomas's 2008 indictment, Jeffrey worked for Thomas's construction businesses, first as a laborer and then as a supervisor beginning in 2005. Also in 2005, Jeffrey created his own construction company, Imperial Renovations & Designs (Imperial).

Jeffrey's § 853(n) petition is based on two written assignments from MKP that Jeffrey received in January 2009. Those assignments purported to transfer to Jeffrey a $957,177 interest in two of the four insurance policies that MKP owned, in repayment of debts that MKP allegedly owed Jeffrey.[4] Those debts arose from three sets of transactions: payments by Jeffrey to MKP for a building project; payments by Jeffrey to MKP for insurance premiums; and a commission on a house that Jeffrey had referred to MKP.

The first alleged debt consisted of two checks that Jeffrey wrote to MKP in July 2006 for the construction of a house. In the summer of 2006, Jeffrey told Thomas that he wanted to make more money. Thomas suggested that the two build a house on Brigham Court, in the Dublin, Ohio area. Thomas also told Jeffrey that Jeffrey needed to "bring some money to the table." After that conversation, Jeffrey took out two mortgages on his own house to provide financing.

---

[3] Jeffrey also pled guilty in 2011 to a misdemeanor for making a false statement on a loan application that was involved in Thomas's scheme. Jeffrey was sentenced to probation.

[4] Although Jeffrey obtained an assignment of $957,177 on two policies, he maintains that he sought to recover only $957,177. Jeffrey testified that he received assignments on more than one policy because he anticipated that the policies would sell for a low amount.

The mortgages yielded $480,969 and $298,590 in cash, and Jeffrey wrote two checks to MKP in those amounts. Jeffrey expected Thomas to put his own money toward the project, too, but the Brigham Court house was never built. In this ancillary proceeding, Jeffrey has asserted that MKP owes him approximately $792,323 due to the unsuccessful Brigham Court project, a figure that includes the two payments to MKP and the closing costs for the two mortgages. That figure also represents the bulk of the $957,177 that Jeffrey seeks to remove from the forfeiture order.

In the fall of 2008, more than two years after Jeffrey's payments to MKP for the Brigham Court project, several other financial transactions took place involving MKP, Imperial, Thomas, and Jeffrey. As relevant here, on September 23 and 24—approximately one week after Thomas was arrested—MKP gave Imperial a $793,800 deposit and Thomas wrote Imperial an $85,000 check, for a total of $878,800. Tressa, Jeffrey's wife, testified that the $793,800 deposit from MKP constituted repayment to Jeffrey for the money that he had spent toward the Brigham Court project, and that the $85,000 check from Thomas constituted a partial repayment of another loan that Jeffrey had given MKP several days prior. Jeffrey and Tressa, however, soon returned most of the funds. The couple testified that they came to believe that they should not keep the money at that time, because doing so would prevent MKP from paying the contractors who were working on a client's house. At the end of 2008, MKP's alleged debt for Jeffrey's Brigham Court expenses thus remained unpaid.

Between October 2008 and January 2009, Jeffrey also wrote five checks to MKP— totaling $107,539—that provide the second asserted basis for the written assignments that Jeffrey received from MKP. Jeffrey purportedly wrote those checks to pay the premiums on the insurance policies. He testified that he paid the premiums because the broker handling the policies, Mike McCloskey, told him that the policies would lapse if the premiums were not paid.

Jeffrey also talked with Thomas and Roger in late 2008 about selling the policies so that Jeffrey could be repaid for his Brigham Court expenses, but the efforts to sell proved fruitless at that time.

By early December 2008, Thomas had been incarcerated for nearly three months. At that time, a federal prosecutor contacted Jeffrey for an off-the-record proffer meeting. Before the proffer meeting, Jeffrey and his criminal defense attorney signed acknowledgement of a letter apprising them of the ongoing grand-jury investigation of several individuals for "bank fraud, money laundering, tax evasion, filing false tax returns, obstruction of justice, and conspiracy to defraud the United States and to commit other federal offenses." Also in December 2008, Jeffrey hired another attorney to protect his rights to the money that MKP allegedly owed him. Jeffrey, Tressa, and the attorney determined that MKP owed Jeffrey $957,177. They reached this number by adding together the amount that Jeffrey spent toward the Brigham Court project ($792,323), the amount paid for the insurance premiums ($107,539), and a referral commission of about $66,000 that MKP allegedly owed Jeffrey for referring a client's house to the company.[5] Jeffrey decided to recover the $957,177 by obtaining an interest in the life-insurance policies that MKP owned. Jeffrey filled out assignment forms that he had received from the companies, and Thomas signed two of them. The insurance companies then accepted those assignments, which each transferred to Jeffrey an interest of $957,177.

After the forfeiture proceeding in Thomas's criminal case—where the district court held that Thomas had forfeited his interest in the insurance policies—Jeffrey filed two third-party petitions under 21 U.S.C. § 853(n) to remove his asserted $957,177 interest in the policies. Section 853(n) provides for an ancillary proceeding in which certain innocent petitioners can

---

[5] These three figures do not add up to $957,177. Assuming that the first two figures are accurate, that leaves only $57,315 to account for the referral commission.

challenge a forfeiture order entered in a criminal case. Jeffrey argued that under § 853(n)(6)(B), he qualified as a bona fide purchaser of his assignment interest. The district court disagreed, denying Jeffrey's petitions after a two-day ancillary hearing that included testimony from Jeffrey and Tressa. According to the court, the petitions failed for three reasons: Jeffrey (1) "failed credibly to show that he ever made legitimate loans to MKP"; (2) "failed to demonstrate that MKP did not repay the loans before the assignments"; and (3) "failed to prove by a preponderance of the evidence that he was reasonably without cause to believe that the insurance policies were subject to forfeiture when the assignments were made." Jeffrey appeals.

Jeffrey's § 853(n) petitions were properly denied, as he did not prove that he was reasonably without cause to believe that the policies were subject to forfeiture in early January 2009, when the assignments were made. Section 853 "provides that all right, title, and interest in property subject to forfeiture 'vests in the United States upon the commission of the act giving rise to forfeiture under this section.'" *United States v. Huntington Nat'l Bank*, 682 F.3d 429, 433 (6th Cir. 2012) (quoting 21 U.S.C. § 853(c)). Two subsections in § 853(n), however, provide a way for innocent petitioners to avoid the effect of § 853(c)'s relation-back clause and remove their property from the forfeiture order. Jeffrey has sought relief under one of those provisions, § 853(n)(6)(B). That provision requires a petitioner to prove by a preponderance of the evidence that he "is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section." *Id.* The "bona fide purchaser for value" and "without cause" aspects of § 853(n)(6)(B) are related but distinct requirements, *see United States v. Timley*, 507 F.3d 1125, 1130–31 (8th Cir. 2007), and the petitioner bears the burden of proving both. Indeed, we have previously denied a petition solely on the basis that the petitioner could not

satisfy the without-cause requirement. *See, e.g.*, *United States v. Coffman*, 612 F. App'x 278, 287 (6th Cir. 2015). Because Jeffrey did not prove that requirement, we need not and do not decide whether he was a bona fide purchaser for value of an interest in the insurance policies.

As a preliminary matter, the clearly erroneous standard applies to the district court's finding that in January 2009, Jeffrey had cause to believe that the insurance policies were forfeitable. A "district court's findings of fact are reviewed under a clearly erroneous standard." *United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009) (quoting *United States v. O'Dell*, 247 F.3d 655, 679 (6th Cir. 2001)). The question of whether Jeffrey had cause to believe that the policies were forfeitable is predominantly a factual question in the context of this case. The parties dispute primarily what the evidence shows, not what "without cause" means. Accordingly, the clearly erroneous standard applies to the district court's findings on this issue, including its conclusion that Jeffrey "failed to prove by a preponderance of the evidence that he was reasonably without cause to believe that the insurance policies were subject to forfeiture when the assignments were made." In addition, although Jeffrey does raise two sub-issues of law concerning the scope of the without-cause requirement, neither argument requires reversal or remand.

The evidence presented at the ancillary hearing amply supports the conclusion that Jeffrey had cause to believe that the policies were forfeitable. Most significantly, Jeffrey became aware on December 4, 2008 that a grand jury was investigating several people, including Thomas, for money laundering, bank and wire fraud, and other criminal activities. At that point, Jeffrey also knew that Thomas had been incarcerated for nearly three months on obstruction-of-justice and witness-tampering charges. The Government's proffer letter to Jeffrey's counsel, which was signed by Jeffrey on December 4, provides in relevant part:

> As you know, a grand jury in the Southern District of Ohio is conducting an investigation of several individuals concerning possible violations of federal criminal laws, including but not limited to bank fraud, money laundering, tax evasion, filing false tax returns, obstruction of justice, and conspiracy to defraud the United States and to commit other federal offenses. As I explained to you, your client, Jeffrey Parenteau, is a subject of the grand jury investigation due to his conduct as it relates to involvement in several financial transactions under investigation.

This letter put Jeffrey on notice that the Government was investigating not only Thomas's obstruction of justice and witness tampering, but also "financial transactions" and any fraud and money-laundering violations arising out of those transactions. Jeffrey's knowledge of the extent of the investigation, combined with his testimony at the ancillary hearing, provides a sufficient basis for denying his petition. At the ancillary hearing, Jeffrey admitted that in December 2008, he knew that investigators were examining the way that Thomas's businesses were operated. As for the insurance policies, even though Jeffrey testified that he "wasn't in depth with [Thomas] about how he paid his bills," Jeffrey knew that the insurance premiums were paid for "through houses and [the] money [Thomas] made." This testimony links the insurance policies to the investigation of Thomas's businesses. That link would have provided a reasonable person cause to believe that the policies were forfeitable.

Other factors also support the conclusion that Jeffrey was on notice as to the forfeitability of the policies. By the time of the assignments, Thomas and two of his co-conspirators had been investigated by federal investigators for at least two-and-a-half years, since 2005 or 2006. The length of that investigation would have provided further reason to question the business practices of Thomas and his associates. So would the fact that within several days of Thomas's indictment, Thomas gave Jeffrey $878,800. A transfer of that amount at that particular time suggests that Thomas may have been attempting to shield assets from the Government. Finally, Jeffrey obtained the assignments within one month of the proffer meeting, a fact that tends to

show that Jeffrey learned information in December 2008 that caused him to act quickly with regard to the insurance policies. Indeed, Jeffrey obtained the assignments after being advised by his attorney that doing so would allow Jeffrey "to protect [himself]." One interpretation of that reason for obtaining the assignments is that Jeffrey sought to protect himself from any future action that the Government might take concerning the policies.

Section 853(n)(6)(B) speaks of *cause* to believe, not actual knowledge. *See Coffman*, 612 F. App'x at 287. A petitioner may be disqualified from relief under that statute even if he has not subjectively connected every dot between the suspicious circumstances and the forfeitable property. Even though the hearing testimony suggests that Jeffrey was not aware of the extent of Thomas's criminal activities, this is not a case where only a person with a large imagination in Jeffrey's position would suspect that mischief was afoot regarding the insurance policies. Nor does § 853(n)(6)(B) lend special protection to those who were misled or fooled by family members. A cloud of doubt overshadowed the policies in January 2009, and the district court did not clearly err in holding to that effect. Clear error is present only "when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Max Trucking, LLC v. Liberty Mut. Ins. Corp.*, 802 F.3d 793, 808 (6th Cir. 2015) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573 (1985)). No such error marred the district court's analysis in this case.

Jeffrey contests the dismissal of his petition with four additional arguments, two of a factual nature and two related to scope of the without-cause requirement. None is persuasive.

As for the arguments related to the evidence, Jeffrey first asserts that he would not have attempted to sell the policies in December 2008 and would not have made five premium payments in late 2008/early 2009 if he had suspected that the policies might be forfeitable.

Again, however, § 853(n)(6)(B) does not require a court to evaluate a petitioner's actual knowledge. In addition, neither Jeffrey's payment of the premiums nor his attempt to sell the policies necessarily forecloses the possibility that he had cause to believe that the policies were forfeitable. In Jeffrey's second argument, he suggests that the district court should have abided by its findings in its order denying the Government's motion to dismiss, where the district court noted that Thomas was not charged with a forfeiture allegation until April 2009. Yet nothing prevents a court from denying a defendant's motion to dismiss and then later, after receiving evidence and briefing, denying the petitioner's claim on the merits. Jeffrey's quarrels with the district court's take on the evidence are unavailing.

Nor do Jeffrey's two related legal arguments about the scope of § 853(n)(6)(B)'s without-cause requirement entitle him to relief. In the first place, Jeffrey argues that the district court incorrectly analyzed whether Jeffrey had cause to believe that MKP's *assets*—as opposed to the insurance policies in particular—were forfeitable. It is true that the district court stated at the end of its analysis that Jeffrey had "cause to believe that MKP's assets were subject to forfeiture." But earlier in its opinion, the court made clear that the relevant question was whether Jeffrey had cause to believe that the insurance policies were forfeitable, and our analysis, too, tracks that inquiry. In another variation on that argument, Jeffrey asserts that § 853(n)(6)(B) bars only those petitioners who have cause to believe that the forfeitable property was acquired with proceeds traceable to a criminal violation. According to this argument, nothing suggests that Jeffrey knew that the policies had been purchased with tainted funds. This argument fails as well. The statute under which the policies were forfeited allows for the forfeiture of property "involved in" money laundering in addition to property that is "traceable to" property involved in money laundering. *See* 18 U.S.C. § 982(a)(1). Under § 853(n)(6)(B), then, the question is

whether a petitioner had cause to believe that the property was involved in a money-laundering offense or was traceable to property involved in that offense.  In short, there is no merit to Jeffrey's arguments about the evidence or to his arguments concerning the without-cause requirement.

The judgment of the district court is affirmed.